**TANDY BRANDS, INC.,**
**Plaintiff-Appellee,**

v.

**E. Bradford HARPER,**
**Defendant-Appellant.**

**No. 84-3366.**

United States Court of Appeals,
Fifth Circuit.

May 20, 1985.

As Modified on Rehearing June 10, 1985.

Rehearing Denied July 5, 1985.

Oliver, Stumpf, Falgout & Guynes, Fred W. Stumpf, Houston, Tex., Jerry Read, Gretna, La., for defendant-appellant.

McLean, Sanders, Price, Head & Ellis, Albon O. Head, Jr., Carter L. Ferguson, Fort Worth, Tex., for plaintiff-appellee.

John F. Whitney, New Orleans, La., for Tandy Brands.

Before GARZA, POLITZ and DAVIS, Circuit Judges.

GARZA, Circuit Judge:

In this diversity suit, Tandy Brands, Inc. ("Tandy"), a Delaware corporation with its principal place of business in Fort Worth, Texas, sought and recovered damages and injunctive relief against E. Bradford Harper ("Harper"), a resident of Louisiana. Tandy's theory of recovery was that Har-

per had breached a covenant not to compete with Tandy's wholly owned subsidiary, the Bombay Company ("Bombay"). We affirm in part and reverse in part.

## I

Bombay is a Louisiana corporation engaged in the business of selling antique reproduction furniture. The company was formed by Harper in 1975. Within several years after the company was formed, it had several retail stores in the New Orleans vicinity, and had developed an extensive mail-order business through which it was able to sell goods across the United States and Canada.

Tandy became interested in acquiring Bombay in 1978, and initiated negotiations for purchasing the company at that time. These negotiations proved unfruitful, however, and no acquisition occurred.

Negotiations were reinitiated by Harper in 1980. Tandy representatives and Harper ultimately reached an agreement under which Tandy would acquire a controlling interest in Bombay, and Harper would continue to be employed as president of Bombay. The terms of the sale were set forth in a stock purchase agreement dated July 23, 1980. This agreement provided that Tandy would purchase ninety-eight of Bombay's two hundred outstanding shares from Harper's partner, Robert A. Watson, and sixty-two shares from Harper. Tandy thus acquired one hundred sixty shares, constituting eighty percent of Bombay's outstanding stock. Harper retained forty shares, reflecting a twenty percent interest in the company. The stock purchase agreement provided that while Tandy owned only eighty percent of the company, it had the right to vote one hundred percent of the shares. The stock purchase agreement also contained a covenant not to compete. This covenant provided, in effect, that for a period of three years following the termination of his employment (or until August 31, 1984, whichever came later), Harper could not become involved in any business similar to Bombay, anywhere in the United States or Canada.

Simultaneously with the execution of the stock purchase agreement, Harper and Tandy executed a stock option agreement granting Tandy the option to purchase Harper's remaining twenty percent interest in Bombay. Tandy could exercise the option at the termination of Harper's employment by Bombay, or at any time after the net book value of Harper's interest in the company was equal to or greater than $1,000,000. Additionally, along with the stock purchase and option agreements, Harper entered into an employment agreement with Bombay. This agreement provided that Harper would have the title of president and general manager, be employed for a period of fifty months, and receive as compensation a stated salary plus a bonus based on the company's profits. This agreement contained a covenant not to compete identical to the one contained in the stock purchase agreement. All three agreements contained "choice of law" clauses stating that the contracts were to be construed and enforced under Texas law.

Following Tandy's acquisition of Bombay, it sent Michael Kerr to New Orleans to oversee Bombay's operations. Personality conflicts developed between Kerr and Harper. In January, 1981, following Harper's return from an overseas buying trip, Kerr questioned Harper about certain expenses. Harper, believing that Kerr was attempting to usurp his authority as president and general manager, became upset; he submitted his resignation the following day. His resignation stated that he was leaving the company for "personal reasons". Two months later, pursuant to the stock option agreement, Tandy purchased Harper's remaining twenty percent interest in Bombay. At that time, according to Tandy, the company had a negative net worth and the stock was worthless; consequently, no additional consideration was paid for the stock.

In December, 1981, Harper formed the British Sports Shop, Inc. ("British Shop"). The British Shop opened stores in proximity to the Bombay retail stores in New Orleans. Shortly after its formation, the

British Shop began selling antique reproduction furniture similar to the products sold by Bombay.

In June, 1982, Tandy brought suit against Harper in the District Court for the Northern District of Texas, seeking damages and injunctive relief on the theory that Harper was violating the terms of the covenant not to compete contained in the stock purchase agreement. In February, 1983, the case was transferred, on Harper's motion, to the Eastern District of Louisiana. Harper asserted as an affirmative defense the indefiniteness and consequent unenforceability of the covenant not to compete. He also counterclaimed against Tandy, alleging that Tandy had defrauded him into selling control of Bombay; violated the federal securities laws; breached its fiduciary duty owed to Harper as a minority shareholder; and tortiously interfered with his employment contract with Bombay.

The case was tried to a jury. In response to special interrogatories, the jury found that: Harper had not been excused from his promise not to compete with Bombay; Tandy had not engaged in fraud in the inducement of the stock purchase agreement; Tandy had not deceived Harper as to the value of his stock in Bombay; Tandy had not breached its fiduciary duty to Harper as a minority shareholder; and that as a result of Harper's breach of the covenant not to compete, Tandy had been damaged in the amount of $150,000. 5 Record 78. No issue was submitted on Harper's tortious interference with contract allegation. The district court entered judgment in accordance with the verdict, and Harper brought this appeal.

## II

### (A)

Harper's first contention on appeal is that he was denied a fair trial on his counterclaims because of allegedly prejudicial comments made by the trial court judge. Each of the comments complained of were made in response to Tandy's parol evidence rule objections aimed at testimony concerning the employment contract. While the employment contract stated that Harper would have the title "president and general manager," it was silent as to precisely what duties he would have following the takeover. The contract did state, however, that Harper's duties "may include no duties, the amount and scope of such employment duties and authority to be determined by the Board of Directors [of Bombay], in its sole discretion." No resolutions concerning Harper's authority were ever passed by the Bombay Board of Directors.

■ Harper, and several witnesses testifying on his behalf, gave testimony concerning their understanding of what Harper's duties would be following the takeover. The theoretical purpose of this testimony was to show that Harper was fraudulently led to believe that he would have unbridled control of the company, when in fact, according to Harper, Tandy intended to drive him out of the organization as soon as the acquisition was completed. Tandy frequently objected to testimony of this sort, contending that the parol evidence rule precluded any testimony tending to contradict the terms of the employment contract's provision concerning Harper's duties. In most instances, the trial court permitted the testimony; at several points during the presentation of Harper's case, however, the trial court instructed the jury that if it found the terms of the contract to be unambiguous, then it should disregard testimony tending to contradict the terms of the contract. *See* 7 Record 96–97; 6 *id.* 123. Harper contends that testimony reflective of what his duties would be following the takeover was admissible under the fraud exception to the parol evidence rule.[1] Moreover, Harper argues that by entertaining the objections, and by giving the jury cautionary instructions, the trial court

---

1. Under Texas law, fraudulent statements made in the inducement of a contract are admissible regardless of whether they contradict the terms of an integrated writing. *See, e.g., Santos v. Mid-Continent Refrigerator Co.,* 471 S.W.2d 568, 569 (Tex.1971); *Wagner v. Morris,* 658 S.W.2d 230, 232–33 (Tex.App.—Houston [1st Dist.] 1983, no writ).

judge improperly influenced the jury and prejudiced his case.

█ This contention lacks substance. The record as a whole reflects that the trial court judge admitted almost all of the testimony at issue here. In particular, Harper testified that he was led to believe he would remain "at the helm of the ship," and that the only limitation on his authority would be a $2,000,000 ceiling on inventory purchasing. 6 Record 74–75. He also testified that Tandy representatives told him that he could one day be the president of a nationwide chain of retail stores, *id.* at 97, and that although he objected to the employment contract's "no duties" clause, he was told by Tandy representatives not to worry about the clause because changes in his authority would have to be authorized by board resolution. *Id.* at 123. Similarly, witnesses testifying on Harper's behalf were permitted to testify as to their impressions of what Harper's duties were going to consist of following the takeover. In light of the fact that the trial court permitted this testimony, we are hard-pressed to find that the error, if any, of the trial court's instructions concerning the parol evidence rule were anything but harmless. *See* FED.R.CIV.P. 61.

### (B)

█ Harper next contends that the covenant not to compete is overbroad and cannot, therefore, support an award of damages.[2] The covenant, in relevant part, provided that:

> Sellers acknowledge that [Bombay] is actively conducting and will continue to actively conduct its business throughout the United States of America and Canada. Prior to the latter of the following events:
>
> (A) August 31, 1984; or

(B) Three years from the earliest of the following events:

(1) The expiration of the employment period under [Harper's employment contract]; or

(2) Resignation of Harper pursuant to [the employment contract]; or

(3) Termination of [Harper's employment contract],

Harper shall not, within any portion of the United States of America or Canada, directly or indirectly, for himself, or on behalf of, or as an employee, agent, shareholder, partner, representative, adviser, consultant, officer, or director of, any other person, firm, association, or corporation engage in any business similar to or competitive with the business being conducted by [Bombay] on the date that the latter of the events described in (A) and (B) of this section occurs.

Harper was thus precluded from competing with Bombay throughout the United States and Canada for three years following his resignation from Bombay. We are persuaded by Harper's contention that the geographic scope of the covenant is unreasonably large.

█ Under Texas law, an employee's covenant not to compete with his employer is enforceable only if its terms are reasonable. *Weatherford Oil Tool Company v. Campbell*, 161 Tex. 310, 340 S.W.2d 950, 951 (1960). Where the public interest is not involved, the test for determining the validity of the covenant "is whether it imposes upon the employee any greater restraint than is reasonably necessary to protect the business and goodwill of the employer." *Id.* The covenant's duration and territorial scope are factors to be considered in making this determination. *Id.* Moreover, in an action for money damages based on an employee's breach of a cove-

---

**2.** Tandy asserts that Harper has waived appellate review of the reasonableness and enforceability of the covenant not to compete. According to Tandy, this issue was never presented to the trial court. Brief of Appellee at 24. This is simply not the case. Harper first raised the issue of the covenant's enforceability in its an-

swer to Tandy's complaint. 2 Record 543. The issue was again raised by Harper in his motion for summary judgment. *Id.* at 435. Lastly, the issue was raised (and the territorial scope of the covenant was specifically attacked) in Harper's motion for judgment notwithstanding the verdict. 1 *id.* 821, 836–45.

nant not to compete, a court cannot reform the covenant and permit recovery to the extent the covenant is reasonable as re-drafted; rather, the covenant must "stand or fall as written." *Frankiewicz v. National Comp. Associates,* 633 S.W.2d 505, 507 (Tex.1982).

■ Against this backdrop, it is clear that the covenant involved in this case is unreasonable as to territorial scope. There is no support in the record for the proposition that Bombay's business and goodwill could only be protected by a restrictive covenant embracing almost all of the North American continent. We are unpersuaded by Tandy's assertion that this international covenant not to compete is reasonable merely because Bombay advertised its products in a number of magazines with nationwide circulations. The fact that Bombay advertised in such publications does not warrant the conclusion that it had a protectible business interest in every city in the United States and Canada. Nor are we persuaded by Tandy's argument that a finding of reasonableness is compelled because the wording of the covenant acknowledges that Bombay was conducting business throughout the United States and Canada. *See Matlock v. Data Processing Sec., Inc.,* 618 S.W.2d 327 (Tex.1981) (covenant containing acknowledgment of employer's nationwide business activities found to be unreasonable as to territorial scope). While there is evidence in the record to the effect that the majority of Bombay's gross sales resulted from its mail-order business, there is no indication that this aspect of Bombay's business was affected by Harper's operation of the British Shop; indeed, Bombay's current president testified that the British Shop had only a "nominal" effect on Bombay's sales nationwide. 7 Record 14–15. It is apparent that a narrower, less burdensome restrictive covenant would have been suffi-

cient to protect Bombay's business interests. Because the covenant is overbroad as to territorial scope, it is unreasonable as written and will not support an award of money damages. *See Frankiewicz,* 633 S.W.2d at 507.[3]

### (C)

■ Lastly, Harper contends that the trial court erred in refusing to submit to the jury the tortious interference with contract action asserted in his counterclaim. While the record does not reflect the trial court's reasons for failing to instruct the jury or submit an interrogatory on this theory of recovery, Harper states the decision was based on the trial court's conclusion that Louisiana law controlled this aspect of the case. Louisiana law does not, however, recognize the tort of tortious interference with contractual relations. We need not reach the issue of whether the trial court's decision on this choice of law question was correct, however, because Harper waived any error resulting from the trial court's refusal to submit an interrogatory or give an instruction on tortious interference.

■ This case was submitted to the jury on special interrogatories. The seven interrogatories submitted to the jury were preceded in the charge by extensive instructions on the law. The record does not reflect that Harper objected to the trial court's failure to instruct the jury on his tortious interference claim; consequently, any resulting error was waived. *See* FED. R.CIV.P. 51. Harper argues that he did preserve the error: when making his objections to the interrogatories which were submitted, Harper's attorney stated, "we object to the failure of the Court to instruct the jury as to the theory and importance of the breach of contract on Tandy Brand's part." 5 Record 74. Harper contends that

---

**3.** Because we hold that the covenant will not support an award of money damages, we need not address the question of whether Tandy, in its status as a shareholder in Bombay, was capable of recovering damages sustained by Bombay. Nor need we address the issue of whether

the covenant can be reformed, and enforced by injunction to the extent that it is reasonable. The covenant's term ended three years after Harper's resignation; the parties agree that this aspect of the case is now moot.

**654**

this statement could only have related to his tortious interference claim. We disagree. This statement appears to be an objection to the trial court's failure to more clearly explain Harper's defensive theory that he was excused from adhering to the terms of the stock purchase agreement because Tandy had breached the agreement by fraudulently inducing him into selling his stock, and by representing to him that he would have complete control of the business following the takeover. Even if liberally construed, the objection does not appear to be directed towards the trial court's failure to instruct the jury on Harper's tortious interference counterclaim. This objection clearly does not satisfy Rule 51's requirement that a party state "distinctly the matter to which he objects and the grounds of his objection;" similarly, it was not "sufficiently specific to bring into focus the precise nature of the alleged error." *See Delancey v. Motichek Towing Service, Inc.,* 427 F.2d 897, 900 (5th Cir.1970).

■ Additionally, Harper did not object to the trial court's failure to submit any special interrogatories relative to his tortious interference allegation. Any error resulting from this omission was, consequently, waived. "Under Rule 49(a), if a party fails to request a special issue, it waives jury trial on the issue." *J.C. Motor Lines, Inc. v. Trailways Bus System,* 689 F.2d 599, 602 (5th Cir.1982). In the absence of such an objection, the issue cannot be raised for the first time on appeal. *Id.*

### III

In conclusion, for the reasons set forth in Section II(C) of this opinion, that portion of the district court's judgment dismissing Harper's counterclaim against Tandy Brands is affirmed. For the reasons set forth in Section II(B) of this opinion, that portion of the district court's judgment awarding damages in favor of Tandy Brands is reversed.

AFFIRMED IN PART; REVERSED IN PART.