IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

---

No. 02-30039

---

ICEE DISTRIBUTORS, INC.,

Plaintiff-Appellee,

versus

J&J SNACK FOODS CORP., WAL-MART STORES, INC.,
and ICEE OF AMERICA, INC.,

Defendants-Appellants.

---

Appeals from the United States District Court
For the Western District of Louisiana

---

March 21, 2003

Before JOLLY, HIGGINBOTHAM, and MAGILL, Circuit Judges.[*]

HIGGINBOTHAM, Circuit Judge:

These appeals concern a disagreement between two ICEE distributors as to whether one, J&J Snack Foods, can distribute frozen ICEE squeeze-up tubes of various flavors in the same territory that the other, ICEE Distributors, distributes ICEEs in a cup. After a jury trial, the district court entered a permanent injunction barring J&J and Wal-Mart Stores, which sold J&J's squeeze-up tubes within the territory, from continuing to

---

[*] Judge of the Eighth Circuit, sitting by designation.

1

distribute the tubes.  We affirm.

**I**

In the 1960s, the John E. Mitchell Company ("Mitchell Company") developed the ICEE, a semi-frozen beverage consisting of carbonated water and syrup mixed together that stands up when poured into a cup.  Through its subsidiary, ICEEQUIP, the Mitchell Company owned the trademark rights to the ICEE name on products such as the cups for holding the frozen carbonated beverage, the machines for making the beverage, and the beverage itself. ICEEQUIP entered into several trademark licensing agreements with ICEE distributors in different parts of the country.  The plaintiff-appellee, ICEE Distributors, Inc. ("Distributors"), by virtue of its purchase of several regional distributorships that had each entered into these licensing agreements, is a party to these identically-worded agreements for its various distribution territories, which include most of Louisiana and Arkansas, and parts of Texas, Missouri, Alabama, and Georgia.

In the 1980s, the Mitchell Company went out of business.  In response, the regional licensees, including Distributors and The ICEE Company, a subsidiary of J&J, formed ICEE of America ("IOA"). Upon execution of an assignment agreement, IOA acquired the ownership rights and interests in the trademarks previously held by ICEEQUIP.  Both Distributors and The ICEE Company own stock in IOA, with The ICEE Company being the largest shareholder and

2

Distributors the second largest.

In 1999, J&J began manufacturing frozen squeeze-up tubes under the name "ICEE" on a nationwide basis. Appellant Wal-Mart sold these tubes in its Sam's Club stores. Although J&J requested permission from Distributors to sell the tubes in its territory, Distributors refused. J&J sold the tubes in Distributors' territory nonetheless. Distributors filed this suit in May 1999 against J&J and Wal-Mart for trademark infringement and dilution.

After the case was filed, J&J attempted unsuccessfully to register with the U.S. Patent and Trademark Office a trademark for the use of the ICEE name on the tubes. The PTO rejected the application on the basis that the proposed trademark would likely be confused with IOA's trademarks on the ICEE beverage, cups, and beverage machine. J&J then assigned the trademark application to IOA, which successfully registered the trademark. IOA's president, Dan Fachner, who was also the president of J&J's subsidiary The ICEE Company, then granted J&J a license to use the trademark in areas including Distributors' territory.[1]

After execution of the licensing agreement between IOA and J&J, Distributors added IOA as a defendant, alleging that IOA, as the assignee of the trademarks previously held by ICEEQUIP, was

---

[1] A central issue at trial was whether Fachner executed this license with the consent of the board of directors. Certain directors and attendees at the 1999 meeting said that the board only voted to register the tube trademark and allow J&J to sell the tubes within its own territories; others testified that the board voted to allow J&J to sell the tubes nationally.

bound to the licensing agreements with Distributors, and had breached those contracts by entering into the squeeze tube agreement with J&J.  The district court granted summary judgment in the defendants' favor on the trademark infringement claim, but held a trial on the trademark dilution and breach of contract claims, bifurcating the liability and damages stages.  After the liability stage of the trial, the jury found J&J and Wal-Mart liable for willful trademark dilution and IOA liable for breach of contract.

Based on the jury verdict, the trial court subsequently entered a permanent injunction against J&J and Wal-Mart forbidding the sale of squeeze tubes within Distributors' territory. Defendants appeal the injunction pursuant to 28 U.S.C. § 1292.[2]

**II**

**A**

IOA first objects that the verdict against it for breach of contract cannot serve as a basis for the permanent injunction because the district court improperly asserted jurisdiction over IOA.  Accepting the magistrate judge's recommendation, the district court denied IOA's motion to dismiss for lack of personal jurisdiction.  In its motion, IOA, a Texas corporation with its principal place of business in California, claimed that it was not

---

[2] 28 U.S.C. § 1292(a)(1) ("[T]he courts of appeals shall have jurisdiction of appeals from: (1) Interlocutory orders of the district courts of the United States ... granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions ....").

4

subject to personal jurisdiction in Louisiana because it had never engaged in business in the state, had never owned or occupied any property in the state, had never employed any person who worked or lived in the state, had never earned, generated, or received any income in or from the state, and had never entered into or acquired an interest in any contract or license to be performed in the state.

In response, Distributors argued, *inter alia*, that the Mitchell Company's assignment of trademark rights to IOA resulted in IOA becoming a party to the license agreements between Distributors and ICEEQUIP, which were to be performed in part in Louisiana.

The magistrate judge concluded that although the jurisdictional issue was "admittedly close," Distributors put forth a prima facie case for jurisdiction because of the license agreements between Distributors and IOA. It explained, "[i]t is entirely reasonable for the person who grants another party an exclusive territory to expect to be haled into court in that territory should it breach its promise." However, it stated that "to prevail at trial on the jurisdictional issue," Distributors "will have to produce substantially more evidence (and legal authority) than it has shown on this motion."

On appeal, Distributors reurges that IOA is subject to specific jurisdiction because ICEEQUIP's assignment of its

5

trademark rights to IOA meant that IOA became a party to the exclusive licensing agreements ICEEQUIP had executed with its regional distributors. This lawsuit arises from IOA's breach of these agreements, which occurred when IOA granted a license to J&J to sell push-up tubes in Distributors's territory, including Louisiana. Thus, Distributors argues that IOA should have reasonably anticipated being haled into court in Louisiana for intruding upon Distributors' exclusive territory there.

**B**

"Whether in personam jurisdiction can be exercised over a defendant is a question of law subject to *de novo* review by this court."[3] In determining whether to exercise jurisdiction over a nonresident defendant, we must look to the restrictions of the state long-arm statute and the Due Process Clause.[4] In Louisiana, this becomes a unitary inquiry, because the state long-arm statute extends jurisdiction over nonresidents to the extent allowed by federal due process.[5] Extension of jurisdiction over IOA satisfies due process if IOA had sufficient minimum contacts with the forum state so that extension of jurisdiction over it comports with

---

[3] *Patin v. Thoroughbred Power Boats Inc.*, 294 F.3d 640, 652 (5th Cir. 2002).

[4] *Id.*

[5] *Id.*

6

"traditional notions of fair play and substantial justice."[6]

A court may exercise specific, as opposed to general, jurisdiction over a nonresident defendant if "the lawsuit arises from or relates to the defendant's contact with the forum state."[7] A defendant's singular act can be a sufficient basis for jurisdiction "if that act gives rise to the claim being asserted," so long as the defendant "reasonably anticipate[s] being haled into court" in the forum state.[8]

Because Distributors prevailed in the district court, we must review the complaint and any factual disputes in favor of the exercise of personal jurisdiction, and "all reasonable inferences from the facts thus established are drawn in favor of the prevailing plaintiff. However, the facts thus arrived at must be sufficient to *affirmatively* show personal jurisdiction."[9]

Contracting with a resident of the forum state does not alone

---

[6] *Id.* at 652 n.17 (internal quotation marks omitted).

[7] *Stripling v. Jordan Prod. Co., LLC*, 234 F.3d 863, 871 (5th Cir. 2000) (internal quotation marks omitted).

[8] *Id.* at 872 (internal quotation marks omitted).

[9] *Felch v. Transportes Lar-Mex SA De CV*, 92 F.3d 320, 327 (5th Cir. 1996); *see also id.* at 326 n.16 ("[T]o the extent of any actual conflicts in the evidence, we resolve these in favor of [the plaintiff], as we do also any choice of reasonable inferences to be drawn from the evidence; we likewise credit the nonconclusional factual allegations of the complaint to the extent those are not controverted by any of the evidence; however, the facts thus arrived at must be sufficient to affirmatively show personal jurisdiction where, as here, that has been properly challenged.").

support the exercise of jurisdiction over the defendant.[10]  "Instead we look to the factors of prior negotiations, contemplated future consequences, terms of the contract, and the parties' actual course of dealing to determine whether [IOA] purposefully established minimum contacts with the forum."[11]

The textbook case of *Burger King Corp v. Rudzewicz*[12] dealt with a contractual relationship similar to that between IOA and Distributors.  The plaintiff, Burger King, sued a franchisee, Rudzewicz, for breach of the franchise agreement's payment provision and for trademark infringement; the allegations stemmed from Rudzewicz's failure to pay required monthly amounts to Burger King and his continued use of the Burger King trademarks at his restaurant after termination of the franchise.[13]  Burger King filed suit in Florida, the location of its headquarters, even though Rudzewicz's franchise was in Michigan.[14]  Rudzewicz argued that he was not subject to personal jurisdiction in Florida because his restaurant was located in Michigan and he had never even visited Florida.[15]

---

[10] *Colwell Realty Inv., Inc. v. Triple T Inns of Ariz., Inc.*, 785 F.2d 1330, 1334 (5th Cir. 1986).

[11] *Stuart v. Spademan*, 772 F.2d 1185, 1193 (5th Cir. 1985).

[12] 471 U.S. 462 (1985).

[13] *Id.* at 468-69.

[14] *Id.* at 466.

[15] *Id.* at 479.

The Court found otherwise, concluding that "this franchise dispute grew directly out of 'a contract which had a *substantial* connection with that State.'"[16] Rudzewicz had "eschew[ed] the option of operating an independent local enterprise," and instead deliberately "'reached out beyond' Michigan and negotiated with a Florida corporation for the purchase of a long-term franchise and the manifold benefits that would derive from affiliation with a nationwide organization."[17] It found that "[i]n light of Rudzewicz'[s] voluntary acceptance of the long-term and exacting regulation of his business from Burger King's Miami headquarters, the 'quality and nature' of his relationship to the company in Florida can in no sense be viewed as 'random,' 'fortuitous,' and 'attenuated.'"[18] Furthermore, the defendant's default on the required payments and illegal use of Burger King's trademarks "caused foreseeable injuries to the corporation in Florida" and therefore "it was, at the very least, presumptively reasonable for Rudzewicz to be called to account there for such injuries."[19]

Similarly, IOA's predecessor, ICEEQUIP, and Distributors were parties to agreements granting Distributors an exclusive license over a region that included most of Louisiana, and ICEEQUIP

---

[16] *Id.*

[17] *Id.* at 479–80.

[18] *Id.* at 480.

[19] *Id.*

accepted a long-term relationship that contemplated its oversight of Distributors' actions in that territory: under the contract, ICEEQUIP had the right to inspect locations there and to test the equipment to ensure that ICEE quality standards were met. It also undertook the responsibility to use its best efforts to maintain in force the trademarks for the Distributors's continued use in the specified territories.[20]

IOA's connection to the state of Louisiana thus cannot be viewed as random or fortuitous. IOA's predecessor to the contract, ICEEQUIP, chose the geographic territory to be controlled by the exclusive licenses to which Distributors is now a party, and ICEEQUIP bargained for certain regulatory powers in regard to that

---

[20] The contracts provide:

4. LICENSEE agrees (a) to maintain the standards of quality for the various goods to which the trademarks relate, as set forth in Appendix 4 attached hereto; (b) at all times to use its best efforts toward the meeting of said standards of quality; (c) on reasonable notice from ICEEQUIP, to allow a qualified representative of ICEEQUIP to make periodic inspections and tests during normal business hours at machine locations to insure that said quality standards are being met. In the event ICEEQUIP notifies LICENSEE that said quality standards have not been met and provides specific data and facts in support thereof, LICENSEE shall have sixty (60) days either to correct such failure or to discontinue use of Trademarks at any such location.

5. ICEEQUIP agrees, at its expense, to use its best efforts to maintain in force the various Trademarks, which maintenance shall include, but not be limited to, the timely filing of Affidavits of Use and Applications for Renewals, and further agrees to use its best efforts to obtain trademark registrations on the pending trademark applications listed in Appendix 1....

10

area.  Moreover, IOA's contracting with J&J, which gave J&J a license that overlapped geographically with Distributors', "caused foreseeable injuries" to Distributors within its territory, and it is therefore reasonable for IOA to be called to account there for such injuries.

IOA briefly argues that it is not a party to the license agreements with Distributors.  It explains that although IOA maintains the registration of the ICEE marks, it did not merge with or expressly assume the liabilities or obligations of the Mitchell Company or its affiliates such as ICEEQUIP.  However, it admits that it executed an assignment agreement which gave it the ownership rights to the trademarks previously held by ICEEQUIP. IOA could only acquire the rights held by the Mitchell Company at the time of the acquisition, which were those rights reserved by the Mitchell Company and its affiliates in the license agreements. "[F]ollowing a proper assignment [of a trademark], the assignee steps into the shoes of the assignor."[21]  In other words,

---

[21] *Premier Dental Prods. Co. v. Darby Dental Supply Co.*, 794 F.2d 850, 853 (3d Cir. 1986); *see also Westco Group, Inc. v. K.B. & Assocs., Inc.*, 128 F. Supp. 2d 1082, 1087 (N.D. Ohio 2001) ("Defendant K.B. & Associates says th[e] integration clause in the 1995 Agreement does not set aside the 1989 Agreement.  K.B. & Associates says the 1995 Agreement only supersedes previous agreements 'between the parties [t]hereto.'  Because Plaintiff Westco was not a named party in the 1989 Agreement, K.B. & Associates says the 1995 Agreement has no effect on the 1989 Agreement.  This argument does not persuade.  In 1993, Jer-Wil, the named party in the 1989 Agreement, assigned its rights in the Mattress Warehouse trademark and trade name to Plaintiff Westco. At that point, Westco stepped into the shoes of Jer-Wil for

> [I]f the assignment is valid, and the assignee carries on use of the mark as it was in the past, a continuity of the mark and its good will is preserved .... Such an assignee, by following in the footsteps of the assignor, acquires not only all the rights and priorities of the assignor, but also any burdens and limitations on use that were incumbent on the assignor.[22]

Therefore, IOA was bound by the same contractual terms relating to the trademarks as ICEEQUIP had been during its term of ownership. IOA is a party to the license agreement with Distributors and through the agreement established sufficient minimum contacts with Louisiana.

This being so, we must also consider whether the "fairness" prong of the jurisdictional inquiry is met.[23] Here, we consider the burden upon the nonresident defendant, the forum state's interest in the litigation, the plaintiff's interest in securing relief in that forum, "the interstate judicial system's interest in obtaining the most efficient resolution of controversies," and "the shared interest of the several States in furthering fundamental substantive social policies."[24] IOA has pointed to none of these

---

purposes of the 1989 Agreement.").

[22] J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 18:15 (4th ed. 2002); *see also* SEIGRUN D. KANE, TRADEMARK LAW: A PRACTITIONER'S GUIDE § 20:1 (3d ed. 2001) ("A trademark assignment is a transfer of ownership. The trademark owner (assignor) gives up all rights to the mark. Those rights are acquired by the assignee, who stands in the shoes of the assignor.").

[23] *Felch v. Transportes Lar-Mex SA de CV*, 92 F.3d 320, 324 (5th Cir. 1996).

[24] *Id.* at 324 n.9.

factors as militating against exercising jurisdiction over it in this case. In fact, several factors weigh in favor of jurisdiction. Louisiana has an interest in the litigation because it concerns which entity has the right to utilize the push-up tube trademark in the state. Distributors, which counts Louisiana as a major part of its territory, has a similarly strong interest in pursuing this suit there. Furthermore, as a matter of judicial economy, the best place for resolution of the issues presented is in this suit, where claims against the three allegedly offending parties – IOA, J&J, and Wal-Mart – can be resolved together in a court located in the disputed territory. We hold that conferring jurisdiction over IOA does not offend traditional notions of fair play and substantial justice in this case.

## III

IOA urges that even if it was subject to the district court's jurisdiction, the trial court nevertheless erred in entering the injunction based on the jury's breach of contract finding because IOA did not breach the license agreements with Distributors. We review the district court's grant or denial of a permanent injunction for abuse of discretion.[25] The trial court abuses its discretion if it "(1) relies on clearly erroneous factual findings when deciding to grant or deny the permanent injunction, (2) relies

---

[25] *Peaches Entm't Corp. v. Entm't Repertoire Assoc.*, 62 F.3d 690, 693 (5th Cir. 1995).

13

on erroneous conclusions of law when deciding to grant or deny the permanent injunction, or (3) misapplies the factual or legal conclusions when fashioning its injunctive relief."[26] The district court here did not make any express findings of fact or conclusions of law supporting the injunction, as required by Federal Rule of Civil Procedure 65(d). "While a court's failure to do so does not require that the injunction be reversed or vacated, particularly when there is a jury verdict on which an injunction [is based], the absence of findings does require some conjecture on our part."[27] It calls on us to "'examin[e] the record to determine if ... sufficient evidence supports the issuance of injunctive relief.'"[28]

IOA argues that the license agreement with Distributors does not cover the trademark on the push-up tubes, but only those trademarks on the beverage, beverage machine, and cups. Because of the limited nature of the agreement with Distributors, IOA could not have breached that contract by entering into the licensing agreement with J&J for use of the trademark on the push-up tubes. IOA cites language from the contract providing that the licensor agrees "to grant no other licenses under the Trademarks in the Marketing Area." The agreement defines "Trademarks" as the federal

---

[26] *Id.*

[27] *Professional Ass'n of College Educators, TSTA/NEA v. El Paso County*, 730 F.2d 258, 273 (5th Cir. 1984).

[28] *Id.* (quoting *Sampson v. Murray*, 415 U.S. 61, 86 n. 58 (1974)).

14

trademark registrations and applications for registration listed in its appendix 1, which include trademarks, trademark registrations, and applications for the FCB, FCB machine, and cups, but not for push-up tubes.

Distributors responds by singling out the contract's statement that Distributors received "a license under the Trademarks and under any registrations which may issue to ICEEQUIP relating to the Trademarks." It argues that this contractual language implies that it received the rights not only to the trademarks, registrations, and applications listed in appendix 1 of the license agreement, but also to any other registrations "relating to the Trademarks" that may be issued in the future, such as an ICEE trademark on push-up tubes.

Although IOA argues on appeal that the breach of contract issue should not have been submitted to the jury because the contract unambiguously shows that the push-up tube license falls outside of the contract with Distributors, we find the contract is ambiguous.[29] Although in its appendix 1 it lists all of the trademark registrations and applications that compose the term

---

[29] *See Martin Exploration Co. v. Amoco Prod. Co.*, 637 So. 2d 1202, 1205 (La. App. 1st Cir. 1994) ("Whether a contract is ambiguous or not is a question of law."). Appellants assert in a footnote that the district court should have applied Texas, not Louisiana, contract law to this dispute, because some of the license agreements at issue were executed in Texas. Because appellants have not shown that they raised this issue below, it is waived. *Tandy Brands, Inc. v. Harper*, 760 F.2d 648, 653 (5th Cir. 1985).

15

"Trademark" as used in the agreement, the document also appears to provide that other registrations outside of those listed in appendix 1, but "related to" them, are affected. Thus, the court properly submitted this issue of fact to the jury for resolution.[30]

IOA put forth the argument at trial that the phrase "related to the Trademarks" meant only those marks used with ICEE in a cup. It asserted that this was so because the contract only provided quality-control standards for ICEE in a cup, not for any other type of ICEE product, such as ICEE in a tube. IOA alternatively asserts now on appeal that "any registrations which may issue ... relating to the Trademarks" meant only the registration that would issue if the PTO accepted the pending application listed in appendix 1, and successful renewal applications for the already-registered marks in appendix 1.

However, this argument overlooks the fact that the term "Trademark," as used in the contract, already encompasses every item in appendix 1, including the registration application listed there. The contract's provision that "ICEEQUIP hereby grants to LICENSEE a license under the Trademarks" is therefore sufficient to include a grant of a license under the trademark application and renewals of the previously registered marks, especially when combined with the provision in the following sentence that "[t]he

---

[30] *See Total Minatome Corp. v. Union Tex. Prods. Corp.*, 766 So. 2d 685, 690 (La. App. 2d Cir. 2000) ("[W]hen a contract is determined to be ambiguous, an issue of material fact exists....").

16

license granted hereunder shall be for the life of the Trademarks [i.e., those items listed in appendix 1] and their registrations." Read this way, "registrations which may issue ... relating to the Trademarks" would be a superfluous term, because the applications listed in appendix 1 and its potential registrations, as well as any registration renewals, are covered by the immediately preceding contractual provision. This suggests that the phrase "and under any registrations ... relating to the Trademarks" may refer to registrations distinct from the list in appendix 1.

The record fully supports the jury and district court's apparent finding that the contract gave Distributors a right to marks obtained in the future related to the ICEE business.[31] First, the evidence suggests that in these contracts ICEEQUIP granted regional licenses for every ICEE trademark in its possession, which indicates its intent to license all ICEE marks. Additionally, IOA appears to have continued the practice of allowing regional distributors to use all of the ICEE marks. For instance, in 1995 IOA obtained a registration for use of the name "ICEE" on several types of promotional items, such as beach bags, bicycles, pens, coolers, towels, t-shirts, and toys. IOA's president, Dan Fachner,

---

[31] *See id.* ("[W]hen the terms of a written contract are susceptible to more than one interpretation, or where there is uncertainty or ambiguity as to its provisions, or the intent of the parties cannot be ascertained from the language employed, extrinsic evidence is admissible to clarify ambiguity or to show the parties' intent.... A doubtful provision must be interpreted in light of the nature of the contract, equity, usages, [and] the conduct of the parties before and after the formation of the contract....").

admitted that IOA allows all of its regional distributors to use the mark on these promotional items. This practice suggests that neither IOA nor its regional distributors believed they needed any other licensing agreement to confer exclusive licensing rights on them for use of this mark.

Furthermore, the actions of J&J at the time it was developing the concept of the ICEE push-up tubes demonstrate that it implicitly acknowledged that the regional distributors had a "right of first refusal" for the use of ICEE marks in their respective territories. At trial, J&J emphasized that it offered the distributors the opportunity to sell the tubes in their regions. It also had Fachner send out a letter requesting permission from these distributors for J&J to sell the tubes in their territories.[32] This also implies that the custom, as memorialized in the license agreements, was that distributors had the rights to use all ICEE marks in their regions.

This evidence supports the jury's and the district court's implicit factual finding that the license agreements between

---

[32] The letter provides in part:

.... J&J Snack Foods will begin selling the ICEE tubes this year .... This means that there is an opportunity that some grocery chains may be selling the product regionally including the territory you operate in. We all agree that this can be an excellent way to continue to promote and to strengthen the over all [sic] value and equity of the ICEE brand.

Please acknowledge your understanding of this by signing below. If you have any questions, please call.

ICEEQUIP and Distributors encompassed not only the registrations and applications listed in appendix 1, but also all other ICEE marks.

Nor are we persuaded by IOA's contention that the verdict did not support an injunction.[33]   We find no error in the district court's implicit finding that Distributors would suffer irreparable harm should J&J and Wal-Mart continue distributing the tubes in Distributors' area in violation of Distributors' contractual rights to the tube trademark.[34]   Although Distributors could potentially prove past lost profits enabling it to recover some measure of damages, it would be considerably more difficult for it to prove the amount of damages owed from J&J and Wal-Mart's future sale of

---

[33] J&J and Wal-Mart do not argue that the injunction, based on IOA's breach of contract, is unenforceable as to them under Federal Rule of Civil Procedure 65(d), which provides that an injunction is only binding upon the party against whom the claim is asserted and "their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise."   Therefore, this argument is waived. *Tandy Brands, Inc. v. Harper*, 760 F.2d 648, 653 (5th Cir. 1985).

[34] *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 392 (1981) (reasoning that "a federal district court [should] consider four factors when deciding whether to grant a preliminary injunction: whether the plaintiff will be irreparably harmed if the injunction does not issue; whether the defendant will be harmed if the injunction does issue; whether the public interest will be served by the injunction; and whether the plaintiff is likely to prevail on the merits"); *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 546 n.12 (1987) ("The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success.").

the tubes.

## IV

## A

The district court rested the injunction on the jury's findings regarding both breach of contract and trademark dilution. J&J and Wal-Mart urge that the trademark dilution would not support injunctive relief because IOA, rather than Distributors, owns the ICEE trademarks and therefore Distributors could not sue under the Federal Trademark Dilution Act. The purpose of the Act is "to protect trademarks from unauthorized users who 'attempt to trade upon the goodwill and established renown of such marks.'"[35] To that end, the Act provides that

> [t]he *owner* of a famous mark shall be entitled, subject to the principles of equity and upon such terms as the court deems reasonable, to an injunction against another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark ....[36]

Appellants assert that since the federal trademark registrations show that IOA owns the trademarks, Distributors has no standing to sue under the Act.

Distributors counters that the jury weighed the evidence and found that Distributors owned the ICEE trademarks with respect to

---

[35] *Ringling Brothers-Barnum & Bailey Combined Shows, Inc. v. B.E. Combined Shows, Inc.*, 937 F. Supp. 204, 208 (S.D.N.Y. 1996).

[36] 15 U.S.C. § 1125(c) (emphasis added).

its distribution territory; that while the trademark registrations' listing of IOA as the owner is prima facie evidence of IOA's ownership rights,[37] its agreements with IOA, granting Distributors an exclusive license to use the trademarks in its territory, constitute an assignment of rights, not a license. It points to language in *Quabaug Rubber Co. v. Fabiano Shoe Co.*, in which the First Circuit explained,

> [some courts] have permitted trademark infringement suits to be maintained by exclusive distributors and sellers of trademarked goods, i. e., "exclusive licensees" who had a right by agreement with the owner of the trademark to exclude even him from selling in their territory.[38]

It further relies upon the principle that "[e]ven though a contract states that it is a 'license,' a court will not be governed by form, and the contract will be upheld as an assignment of trademark rights if that is its actual legal effect."[39]

Distributors points to its exclusive right to use the trademarks in its territory, its license for the life of the trademarks, its exclusive right to sue for trademark infringement

---

[37] *See* 15 U.S.C. § 1057(b) ("A certificate of registration of a mark upon the principal register provided by this chapter shall be prima facie evidence of ... the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the certificate ....").

[38] *Quabaug Rubber Co. v. Fabiano Shoe Co.*, 567 F.2d 154, 159 (1st Cir. 1977); *see also id.* at 159 n.8 ("an exclusive licensee is an assignee").

[39] J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 18:5 (4th ed. 2002).

in its territory, and its unconditional right to transfer or assign its rights in the trademarks.

Appellants reply that under the contract IOA retained ownership rights to the trademarks; that the agreement expressly states that the licensor is the owner of the marks and that Distributors is not granted ownership of the marks, but a "license ... to use" the trademarks in connection with the "terms, conditions and limitations" of the agreement. They also point out that the contract provides that IOA, as owner, can exercise continuing control over the marks by requiring Distributors to maintain quality control standards and by mandating that Distributors either correct violations of such standards within a certain period of time or cease using the mark at the location of the violation. The argument continues that the contractual provision requiring Distributors to promptly notify IOA of infringements and aid IOA in investigating infringements demonstrates that IOA is the actual owner of the marks. That the contract also designates IOA as the party who must maintain the trademarks by filing affidavits of use and applications for renewal is, in appellants' view, also determinative of the ownership issue. Finally, appellants explain that the contract provided that Distributors' license payments were to be categorized for tax purposes as payments for the licensing – *not the sale* – of the trademarks, which indicates the contracting parties' intent was to

create an exclusive license, not an assignment.[40]

**B**

"[A] license to use a mark ... is a transfer of limited rights, less than the whole interest which might have been transferred."[41] As one court has explained,

> One of the ways that the law extends the benefits of trademarks and protects incentives to develop them is by allowing trademark owners to license the use of their marks to distributors and franchisees. Such licensing allows more information to be conveyed to more consumers *without the licensor having to risk losing title to its mark*.[42]

It would be antithetical to the basic principles of trademark law to extend to a licensee the rights of an assignee without caution, since deeming a licensee an assignee would allow the assignee to hold the registered trademark owner liable under trademark law, rather than simply under contract law, for diluting the mark by utilizing a similar trademark in the assignee's area.

Although "a truly exclusive licensee, one who has the right

---

[40] The contract provided that Distributors' payments "for the license rights granted hereunder" are payments "as defined under Section 1253(a) of the United States Internal Revenue Code." That section distinguishes sales from licenses: "A transfer of a ... trademark ... shall not be treated as a sale or exchange of a capital asset if the transferor retains any significant power, right, or continuing interest with respect to the subject matter of the ... trademark ...."

[41] *Exxon Corp. v. Oxxford Clothes, Inc.*, 109 F.3d 1070, 1076 (5th Cir. 1997).

[42] *TMT North America, Inc. v. Magic Touch GmbH*, 124 F.3d 876, 882 (7th Cir. 1997) (emphasis added).

23

even to exclude his licensor from using the mark" might be considered an assignee since no right to use the mark is reserved to the licensor, an agreement that sets forth "many duties and rights between the parties that are inconsistent with an assignment, such as geographic limitations on the licensee's territory, does not constitute an assignment."[43] The contract at issue here does not explicitly exclude IOA itself from using the marks in Distributors' territory.[44] Moreover, the agreements with Distributors contain strict geographic limitations, and reserves to ICEEQUIP certain rights indicative of ownership, such as IOA's ability to monitor the quality control of Distributors' product and its responsibility to renew the trademark registrations. Taken together, the contractual provisions cited by appellants convince us that the contract is an exclusive license arrangement only, with ultimate control and ownership of the trademarks resting with IOA.

This conclusion is borne out by the testimony of one of IOA's other regional distributors. As part of its case-in-chief, Distributors called Nate Parish, owner of Middle Tennessee ICEE, Inc. He testified that IOA "is the holder of the 'ICEE' trademark,

_____

[43] *Finance Inv. Co. (Bermuda) Ltd. v. Geberit AG*, 165 F.3d 526, 532 (7th Cir. 1998).

[44] Although the contract provides that Distributors may sue a party using the Trademarks in its area "who claims any rights from ICEEQUIP," it does not specifically prohibit ICEEQUIP itself from using the marks in Distributors' region.

24

the look, the block letters, and it's their job to police the trademark in respects to, I guess I'd say the entire country." Parish further explained that at the 1999 IOA board of directors meeting, he made a motion to allow J&J to make the ICEE squeeze tubes and distribute the tubes in J&J's own territory, not nationally. In explaining why a motion was necessary to allow J&J to distribute the tubes even in its own area, the witness stated, "If I was to produce an ICEE cup with the Tennessee Titans, the bear with the Tennessee Titans uniform on, I have to get permission from Icee of America for that to take place."

This exchange between Distributors and their own witness indicates that IOA must give specific permission for regional distributors to either use a trademarked term such as "ICEE" on a different product or alter a trademark. IOA's powers of oversight are inconsistent with the notion that each regional distributor owns the trademarks in their respective territories.[45] Instead, as an umbrella organization for all of the distributors, IOA serves the purpose of "policing the trademarks" within each distributors' individual region to assure that the marks are not being used in an undesirable fashion.

---

[45] Along these lines, appellants persuasively argue that ICEEQUIP executed identical exclusive licensing agreements with several regional distributors, and it would be illogical to hold that these many agreements create a "patchwork of trademark owners," because "[s]uch divided national ownership would jeopardize the goodwill associated with the [t]rademarks, create customer confusion, and diminish the trademarks' value of indicating a single source and quality of ICEE [products]."

25

In conclusion, this evidence indicates that the district court clearly erred in determining that Distributors, not IOA, was the owner of the ICEE registrations.  Because Distributors is not the owner of the marks, but merely an exclusive licensee, it has no standing to sue under the Dilution Act, and the district court abused its discretion in basing its injunction in part on the jury's verdict on the dilution claim.[46]  However, we will not reverse the trial court's grant of injunction because it is independently sustainable as a proper remedy for the breach of contract.

AFFIRMED.

---

[46] We note that, although the licensing contracts between Distributors and IOA give Distributors the power to bring trademark infringement actions in its territory, they do not provide that Distributors may bring trademark dilution claims in its area.