**VIRGIN ISLANDS TELEPHONE CORPORATION, Petitioner,**

v.

**FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents.**

**AT&T Corporation, Intervenor.**

**No. 98–1575.**

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 13, 1999.

Decided Dec. 21, 1999.

Daniel E. Troy argued the cause for petitioner. With him on the briefs was Carl J. Hartmann, III.

Lisa A. Burns, Counsel, Federal Communications Commission, argued the cause for respondents. With her on the brief were Christopher J. Wright, · General Counsel, John E. Ingle, Deputy Associate General Counsel, Joel I. Klein, Assistant Attorney General, U.S. Department of Justice, and Robert B. Nicholson and Robert J. Wiggers, Attorneys. Daniel M. Armstrong, Associate General Counsel, Federal Communications Commission, and Pamela L. Smith, Counsel, entered appearances.

---

Gene C. Schaerr, Mark C. Rosenblum, and James J.R. Talbot were on the brief for intervenor.

Before: SENTELLE, ROGERS and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge ROGERS.

ROGERS, Circuit Judge:

Petitioner, the Virgin Islands Telephone Corporation, is a provider of local telephone service in the U.S. Virgin Islands. AT&T Submarine Systems, Inc. ("AT&T–SSI"), a wholly-owned subsidiary of intervenor, AT&T Corporation, constructs and maintains undersea fiber optic telecommunications cable systems, or, submarine cable systems. In this appeal, petitioner contends that in granting AT&T–SSI's application for cable landing rights as a non-common carrier, the Federal Communications Commission ("Commission") ignored Congress' clear directive in the 1996 Telecommunications Act ("1996 Act") to apply a new regime for distinguishing between common carrier and private carrier services. Petitioner maintains that, under the 1996 Act, "telecommunications services" is defined in a manner that no longer permits the Commission to apply the two-part test of *National Association of Regulatory Utility Commissioners v. FCC*, 525 F.2d 630 (D.C.Cir.1976) ("*NARUC I*"). In petitioner's view, AT&T–SSI would be offering

telecommunications "to such classes of users as to be effectively available directly to the public" as defined by the 1996 Act if its customers used the capacity they bought from AT&T–SSI to provide service to the public. Because the Commission's interpretation of an ambiguous new term in the 1996 Act to mean "essentially" the same thing as "common carrier"—and thus governed by the *NARUC I* framework—is reasonable, we deny the petition.

## I.

AT&T–SSI filed with the Commission an application for authority to land and operate a submarine cable system extending between St. Thomas and St. Croix in the Virgin Islands, pursuant to 47 U.S.C. § 34 (1994).[1] In the application, AT&T–SSI expressed its intention to sell the capacity to common carriers on an indefeasible right of use ("IRU") basis.[2] Petitioner and Telefónica Larga Distancia de Puerto Rico, Inc. ("TLD"), a long distance service provider in the U.S. Virgin Islands–Puerto Rico market, filed petitions to deny AT&T–SSI's application. Petitioner and TLD asserted that the proposed submarine cable system should be operated on a common carrier basis and that AT&T–SSI should accordingly resubmit its application and seek authorization to construct or operate the proposed system under 47 U.S.C. § 214.[3] Shortly after the petitions to deny

---

1. The statute provides, in pertinent part, that "[n]o person shall land or operate in the United States any submarine cable directly or indirectly connecting the United States with any foreign country, ... unless a written license to land or operate such cable has been issued by the President of the United States." 47 U.S.C. § 34.

2. The Commission has previously explained IRU interests as follows:

   An IRU interest in a communications facility is a form of acquired capital in which the holder possesses an exclusive and irrevocable right to use the facility and to include its capital contribution in its rate base, but not the right to control the facility or, depending on the particular IRU contract, any right to salvage.

*Reevaluation of the Depreciated–Original–Cost Standard in Setting Prices for Conveyances of Capital Interests in Overseas Communications Facilities Between or Among U.S. Carriers*, 8 F.C.C.R. 4173 ¶ 2 n. 6 (1993).

3. Section 214(a) provides, in relevant part:

   No carrier shall undertake the construction of a new line or of an extension of any line, or shall acquire or operate any line, or extension thereof, or shall engage in transmission over or by means of such additional or extended line, unless and until there shall first have been obtained from the Commission a certificate that the present or future public convenience and necessity require or will require the construction, or operation, or construction and operation, of such additional or extended line.

were filed, petitioner filed a petition for a declaratory ruling that the proposed submarine cable system should be operated as a common carrier facility.

While the AT&T–SSI application was pending, Congress enacted the Telecommunications Act of 1996, Pub.L. No. 104–104, 110 Stat. 56 (codified in scattered sections of 47 U.S.C.) ("1996 Act"). The 1996 Act, among other things, introduced two new terms, "telecommunications carrier" and "telecommunications service," and defined them as follows:

> The term "telecommunications carrier" means any provider of telecommunications services, except that such term does not include aggregators of telecommunications services (as defined in section 226 of this title). A telecommunications carrier shall be treated as a common carrier under this chapter only to the extent that it is engaged in providing telecommunications services, except that the Commission shall determine whether the provision of fixed and mobile satellite service shall be treated as common carriage.

47 U.S.C. § 153(44) (Supp. III 1997).

> The term "telecommunications service" means the offering of telecommunications for a fee directly to the public, or to such classes of users as to be effectively available directly to the public, regardless of the facilities used.

*Id.* § 153(46). For the purposes of this appeal, the key aspects of these definitions are that "any provider of telecommunications services," except for "aggregators" of such services, is designated a "telecommunications carrier" and that to the extent that a telecommunications carrier is engaged in providing "telecommunications services," it "shall be treated as a common carrier." *Id.* § 153(44). In other words, whether a carrier will be subject to common carrier regulation pursuant to § 153(44) turns on whether it offers "telecommunications for a fee directly to the public, or to such classes of users as to be effectively available directly to the public." *Id.* § 153(46).

The International Bureau ("Bureau") granted AT&T–SSI's application for a cable landing license on a non-common carrier basis. *See AT&T Submarine Systems, Inc.*, 11 F.C.C.R. 14885 ¶ 1 (1996) ("*Bureau Order*").[4] Observing that "[t]he Commission has not yet addressed the issue of how, if at all, the 1996 Act's introduction of the concept of a 'telecommunications carrier' affects the applicability of *NARUC I* standard," *id.* ¶ 15, the Bureau decided that, in any event, AT&T–SSI is not a common carrier because it is neither a "telecommunications carrier" under the 1996 Act nor a "common carrier" under the *NARUC I* standard. *Id.* ¶¶ 13–15.

In examining whether AT&T–SSI is a "telecommunications carrier," or a provider of "telecommunications service," under the 1996 Act, the Bureau looked to the Commission's interpretation of the term "commercial mobile service," as defined in the Omnibus Budget Reconciliation Act of 1993, Pub.L. No. 103–66, Title VI, 107 Stat. 312, 379–401 (codified in scattered sections of 47 U.S.C.) ("1993 Budget Act"). The 1993 Budget Act defined "commercial mobile service" as "any mobile service ... that is provided for profit and makes interconnected service available (A) to the public or (B) to such classes of eligible users as to be effectively available to a substantial portion of the public, as specified by regulation by the Commission." 47 U.S.C. § 332(d)(1). The Commission subsequently read "available ... to the public" as "offered without restriction on who may receive it" and declared that whether a service was available to "such classes of eligible users as to be effectively available to a substantial portion of the public" de-

---

47 U.S.C. § 214(a).

**4.** The Bureau Order disposed of both the petitions to deny AT&T–SSI's application and the petition for a declaratory ruling that the proposed facility must be operated on a common carrier basis. *See Bureau Order* ¶ 8 n.7.

pended on "several relevant factors such as the type, nature, and scope of users for whom the service is intended." *Implementation of Sections 3(n) and 332 of the Communications Act, Regulatory Treatment of Mobile Services,* 9 F.C.C.R. 1411 ¶ 265 (1994) ("*CMRS Order*"). The Commission also stated that a service will not be considered "available to the public" or "effectively available to a substantial portion of the public" if it is "provided only for internal use or only to a specified class of eligible users under the Commission's Rules." *Id.*

Noting the similarity in the definitions of the terms "telecommunications service" and "commercial mobile service," the Bureau concluded that under the 1996 Act, "whether a service is effectively available directly to the public depends on the type, nature, and scope of users for whom the service is intended and whether it is available to 'a significantly restricted class of users.'" *Bureau Order* ¶ 25. The Bureau applied these criteria to AT&T–SSI's proposed facility and found that:

> AT&T–SSI ... will make available bulk capacity in its system to a significantly restricted class of users, including common carrier cable consortia, common carriers, and large businesses. Potential users are further limited because only consortia, common carriers, and large businesses with capacity in interconnecting cables or other facilities and, in many cases, operating agreements with foreign operators, will be able to make use of the cable as a practical matter.

*Id.* The Bureau rejected the argument that AT&T–SSI will be making a service effectively available directly to the public because AT&T–SSI's customers will use the capacity to provide a service to the public, noting that "[s]uch an interpretation is contrary to the plain language of

the [1996 Act] by focusing on the service offerings AT&T–SSI's customers may make rather than what AT&T–SSI will offer."[5] *Id.* ¶ 26. Therefore, the Bureau concluded that AT&T–SSI will not be offering a service "directly to the public, or to such classes' of users to be effectively available directly to the public" and that, consequently, AT&T–SSI is not a "telecommunications carrier" providing "telecommunications service" under the 1996 Act. *Id.* ¶ 29.

The Bureau then considered whether AT&T–SSI should nevertheless be regulated as a common carrier under *NARUC I.* The *NARUC I* test has two parts: "[W]e must inquire, first, whether there will be any legal compulsion ... to serve [the public] indifferently, and if not, second, whether there are reasons implicit in the nature of [the] operations to expect an indifferent holding out to the eligible user public." *NARUC I,* 525 F.2d at 642. The Commission has subsequently interpreted this two-part test to mean that a carrier has to be regulated as a common carrier if it will "make capacity available to the public indifferently" or if "the public interest requires common carrier operation of the proposed facility." *Cable & Wireless, PLC,* 12 F.C.C.R. 8516 ¶¶ 14–15 (1997). The Bureau, applying the two-part test, decided that neither prong of the *NARUC I* standard was applicable to AT&T–SSI's proposed system and that the proposed system may thus be offered on a non-common carrier basis. *See Bureau Order* ¶ 69. The Bureau added, however, that it retained "the right to change the regulatory status of the cable system to common carrier should conditions change in the future." *Id.* ¶ 2.

The Commission denied petitioner's application for review, agreeing with the Bureau that the 1996 Act did not require it to regulate AT&T–SSI as a common carrier

---

**5.** The Bureau also questioned the assumption that AT&T–SSI's customers would sell the capacity to the public because some of the "large businesses [to which the capacity will

be made available] ... would not use the capacity to provide service to the public." *Id.* ¶ 26.

and that "there are no other public interest reasons for doing so." *AT&T Submarine Systems, Inc.*, 13 F.C.C.R. 21585 ¶ 1 (1998) (*"Commission Order"*). In the Commission's view, as it had previously held in *Cable & Wireless*, "the term 'telecommunications carrier' means essentially the same as common carrier" and "does not ... introduce a new concept whereby we must look to the customers' customers to determine the status of a carrier." *Commission Order* ¶ 6 (citing *Cable & Wireless* ¶ 13). The Commission accordingly proceeded to apply the traditional *NARUC I* two-part test to determine whether AT&T–SSI should be regulated as a common carrier under the 1996 Act.

First, the Commission asked, under the second part of the *NARUC I* test, whether AT&T–SSI "intend[ed] to make 'individualized decisions, whether and on what terms to serve.'" *Id.* ¶ 7 (citation omitted). Noting that the Bureau had found that "AT&T–SSI would have to engage in negotiations with each of its customers on the price and other terms which would vary depending on the customers' capacity needs, duration of the contract, and technical specifications," *id.* ¶ 8, the Commission found that AT&T–SSI "will not sell capacity in the proposed cable indifferently to the public." *Id.* The Commission thus concluded that the second part of the *NARUC I* test did not require that AT&T–SSI be regulated as a common carrier. *See id.*

Next, the Commission considered whether, under the first part of the *NARUC I* test, "the public interest requires common carrier operation of the facility." *Id.* ¶ 9. The Commission focused its inquiry on whether AT&T–SSI "has sufficient market power to warrant regulatory treatment as a common carrier." *Id.* The Commission concluded that because "sufficient alternative facilities" to service the St. Thomas to St. Croix route

are available, "AT&T–SSI does not have market power," *Id.* ¶ 11, and the first part of the *NARUC I* test does not require that AT&T–SSI be regulated as a common carrier. *See id.*

## II.

Petitioner principally contends that the Commission's decision to apply the *NARUC I* test to find that AT&T–SSI does not offer "telecommunications services" ignored both the plain language of the 1996 Act and the congressional intent to replace the traditional *NARUC I* test with a new statutory standard that effects a drastic change in the regulatory regime.[6] Further, petitioner maintains that the Commission has ruled in other contexts that providers offering services similar to AT&T–SSI's services are "telecommunications carriers" under the 1996 Act and that the Commission failed to follow its own precedent without adequate explanation. We apply the now familiar standard of review articulated in *Chevron U.S.A. Inc. v. Natural Resources Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

The parties agree that AT&T–SSI does not sell its capacity "directly to the public," and hence the question before the Commission was whether AT&T–SSI's business activities constitute an "offering of telecommunications ... to such classes of users as to be effectively available directly to the public." The first inquiry under *Chevron* is "whether Congress has directly spoken to the precise question at issue." *Id.* at 842, 104 S.Ct. 2778. Neither the text nor legislative history of the 1996 Act shows that Congress has decided whether the activities by AT&T–SSI constitute a "telecommunications service." The phrase "to such classes of users as to be effectively available directly to the public" is sufficiently vague and open-ended to leave the precise issue of how to treat

---

**6.** Because petitioner does not challenge the substance of the Commission's *NARUC I* analysis, we do not reach the question whether the Commission applied the *NARUC I* test correctly.

AT&T–SSI undecided. Taken at face value, the legislative history offers little additional guidance because it simply states that the definition of telecommunications service "recogniz[es] the distinction between common carrier offerings that are provided to the public ... and private services." H.R. Conf. Rep. No. 104–458, at 115 (1996).

Consequently, petitioner's contention that the Commission failed to follow what the text of the 1996 Act "unambiguously" requires is exaggerated. Petitioner claims that "the statutory language requires ... an examination of the 'class of users' served by" AT&T–SSI and that the Commission's refusal to look at the activities of AT&T–SSI's customers thus amounted to a disregard of the statutory directive. Although the plain language of the statute does not preclude petitioner's reading, neither does it compel such a result. The phrase "effectively available directly to the public" can be reasonably read instead as reflecting the *NARUC I* court's emphasis that "carriers need not serve the whole public" to be classified as common carriers. *NARUC I*, 525 F.2d at 642 (citation omitted). The court, after stating that "[w]hat appears to be essential to ... the common carrier concept is that the carrier 'undertakes to carry for all people indifferently,'" *id.* at 641 (citation omitted), stressed that "[t]his does not mean that a given carrier's services must practically be available to the entire public." *Id.* The court then added, "It is not necessary that a carrier be required to serve all indiscriminately; it is enough that its practice is, in fact, to do so." *Id.* (citation omitted). Given that the statute's distinction between "directly available to the public" and "effectively available directly to the public" can be read as reflecting the *NARUC I* court's distinction between serving the entire public and serving only a fraction of the public, it is reasonable to read the statute as adopting the *NARUC I* framework. Therefore, petitioner's contention that the statute requires the Commission to examine AT&T–SSI's customers' activi-

ties to determine AT&T–SSI's status attributes more determinative force to the language of the statute than is warranted.

Because the 1996 Act is silent with respect to the issue of whether AT&T–SSI should be treated as a common carrier, the question under *Chevron* becomes "whether the agency's answer is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843, 104 S.Ct. 2778. The Commission construed the term "telecommunications carrier" by reasoning that it "means essentially the same as common carrier" and that it does not "introduce a new concept whereby we must look to the customers' customers to determine the status of a carrier." *Commission Order* ¶ 6. As support for its conclusion, the Commission looked to its decision in *Cable & Wireless*, where it had concluded that the definition of "telecommunications services" in the 1996 Act was "intended to clarify that telecommunications services are common carrier services," *Cable & Wireless* ¶ 13, citing the above-mentioned legislative history that "the definition of telecommunications service 'recognizes the distinction between common carrier offerings that are provided to the public ... and private services.'" *Id.* (quoting H.R. Conf. Rep. No. 104–458, at 115). Reasoning from this statement in the legislative history, the Commission viewed the definition of "telecommunication services," that is, "the offering of telecommunications for a fee directly to the public or to such classes of users as to be effectively available directly to the public," to be essentially a way of restating the definition of common carrier as clarified by *NARUC I*.

Although the Commission has not provided a detailed explanation of its interpretation of the statute in the decision under review, the rationale in *Cable & Wireless*, on which the Commission relies, constitutes a permissible construction of the statute. As discussed, *Cable & Wireless* based its reading primarily on the legislative history of the 1996 Act. The Confer-

ence Report stated that the definition of telecommunications service "recogniz[es] the distinction between common carrier offerings that are provided to the public ... and private services." H.R. Conf. Rep. No. 104–458, at 115. This emphasis on the distinction between the public and the private echoes the *NARUC I* court's discussion of the term "common carrier." The *NARUC I* court, in discussing the concept of "common carrier," stated that "the critical point is the quasi-public character of the activity involved," *NARUC I*, 525 F.2d at 641, and referred to phrases like "a sort of public trust," "availing themselves of the business of the public at large," and "the public's business" to elucidate the concept. *Id.* at 641–42. In addition, the court used the phrase "public-private dichotomy" to describe "the distinction between common carrier and non-common carrier operators." *Id.* Although the Commission's decision here did not explicitly make this point, the legislative history that *Cable & Wireless* relied on can be reasonably construed as manifesting Congress' intention to maintain the basic public-private dichotomy of *NARUC I*.

We disagree with petitioner's contention that the Commission's use of the *NARUC I* test constitutes a failure to give meaning to the definition of "telecommunications service." It is true that the Commission never explained in detail how its interpretation corresponded to the specific text of the relevant provision.[7] However, the Commission implicitly gave meaning to the statutory language by applying the *NARUC I* test. Under the *NARUC I* test, the key determinant whether a carrier is a common carrier is "the characteristic of holding oneself out to serve indiscriminately," *NARUC I*, 525 F.2d at 642, and whether a carrier is offering services "directly to the public" or making them "effectively available directly to the public" is irrelevant for the purpose of determining one's common carrier status. In

other words, under the Commission's reading of the statute, the emphasis is on the phrase "to the public" that appears in both "directly to the public" and "effectively available directly to the public," and the difference between "directly" and "effectively available directly" is important merely for the purpose of emphasizing the proposition that "common carriers need not serve the *whole* public." *Id.* (emphasis added) (citation omitted). This is a reasonable reading of the statute, and petitioner's repeated demand that the Commission articulate an interpretation of "effectively available directly to the public" that is separate from "directly to the public" evinces its failure to comprehend the structure of the *NARUC I* test and the Commission's application of it.

To the extent that petitioner's challenge rests on the assumption that if all Congress had intended was to clarify the phrase "common carrier" it would not have introduced a new term, it fares no better. First, the two terms, "telecommunications carrier" and "common carrier" are not necessarily identical, and, as intervenor AT&T Corporation urges, we need not decide today what differences, if any, exist between the two. Second, as the Commission points out in its brief, the concept of "common carrier" has not been eliminated by the 1996 Act because "the core provisions of Title II of the 1934 [Communications] Act ... remain in the Act and address the duties of 'common carriers.'" The Commission's theory that Congress attempted to retain the familiar concept of "common carrier" and yet redefine it in a way that is clearer thus seems plausible. Whether this is the most elegant way of providing clarification is, of course, not the issue.

Finally, petitioner's contention that in granting AT&T–SSI's application, the Commission departed from its own precedent without adequate explanation is un-

---

7. Although the Bureau engaged in a textual analysis of sort by referring to the *CMRS Order*, the Commission does not seem to have adopted the Bureau's analysis of the relationship between the instant case and the *CMRS Order*. *See infra* pp. 14–15.

persuasive. First, petitioner refers to the Commission's rulemaking in *CMRS Order*, which interpreted the term "commercial mobile service" defined by Congress as: "any mobile service ... that is provided for profit and makes interconnected service available (A) to the public or (B) to such classes of eligible users as to be effectively available to a substantial portion of the public, as specified by regulation by the Commission." 47 U.S.C. § 332(d). Petitioner contends that the Commission's rulemaking order indicates that it "recognized that by introducing the new concept of CMRS, Congress intended to alter the [Commission's] method for determining which carriers would be subject to common carrier regulation" and "that the phrase 'effectively available' to the public brought within the definition of CMRS services reaching the public either directly or indirectly–like wholesale services." Thus, petitioner implies that because AT&T–SSI's planned activities with the proposed cable system can be characterized as wholesale services, AT&T–SSI, too, should be treated as a common carrier in this case.

Although petitioner's discussion of the *CMRS Order* in its opening brief implies the objection just outlined, petitioner never explicitly contends that the Commission's decision is inconsistent with the *CMRS Order*. Therefore, petitioner may have waived this particular argument. *See Corson & Gruman Co. v. NLRB*, 899 F.2d 47, 50 n. 4 (D.C.Cir.1990) (per curiam). Even if petitioner has not waived it, it is meritless. Petitioner's contention that the Commission considered "effectively available to the public" to include wholesale services mischaracterizes the *CMRS Order*. Nowhere in that decision is there a statement or suggestion that services reaching the public indirectly, such as wholesale services, fall within the meaning of "effectively available to the public." *See CMRS Order* ¶¶ 65–70. Furthermore, even if petitioner were correct that the *CMRS* decision considered wholesale services to be covered by the phrase "effec-

tively available to the public," it is unclear why that is inconsistent with the decision on appeal. Unlike petitioner, who assumes a wholesaler-retailer distinction throughout its briefs, neither the Bureau nor the Commission relied on the distinction for its decision. Instead, the Commission focused on the *NARUC I* test of whether there is an offering of "indiscriminate service" to the public, leaving open the possibility of characterizing a type of wholesaler as a common carrier. Therefore, a mere showing that a previous decision characterized a wholesaler as a common carrier is insufficient to demonstrate an inconsistency between the Order and the previous decision.

Petitioner's further contention that the Commission misapplied the principle announced in the *CMRS Order* is to no avail. Despite the similarities in the language of the provisions considered in the *CMRS Order* and the *Commission Order*, they are not identical: the *CMRS Order* interpreted the phrase "effectively available to a substantial portion of the public," 47 U.S.C. § 332(d)(1), whereas the *Commission Order* interpreted "effectively available directly to the public." 47 U.S.C. § 153(46). Therefore, the terms of the provisions by themselves do not compel the Commission to interpret them in an identical manner.

It is true that the Bureau arrived at its decision, in part, by drawing an analogy to the definition of "commission mobile service" as read by the *CMRS Order*, see *Bureau Order* ¶¶ 24–25, and the Commission's brief even states that "the Commission expressly affirmed" the Bureau's discussion of the *CMRS Order*. To the extent that the Commission followed the analysis provided in the *CMRS Order*, it may be argued that the Commission was obliged to apply the *CMRS Order*'s standard correctly. But, in our view, the Commission never relied on the *CMRS Order*. Although the Commission affirmed the Bureau's decision, it did not adopt the entirety of the Bureau's ratio-

nale. The Bureau's decision was that AT&T–SSI was neither a telecommunications carrier under the 1996 Act nor a common carrier under the *NARUC I* framework. The two legal authorities— the 1996 Act and *NARUC I*—were treated as requiring separate tests, and the Bureau's decision was based primarily on the fact that the two tests, independent from each other, led to the same conclusion. *See Bureau Order* ¶¶ 13, 15. In fact, the Bureau expressed uncertainty concerning the exact relationship between the 1996 Act and the *NARUC I* test. *See id.* ¶ 15. By contrast, the Commission harbored no such uncertainty, and expressly articulated the relationship between the 1996 Act and the *NARUC I* test by stating that " 'telecommunications carrier' means essentially the same as common carrier," *Commission Order* ¶ 6, and then proceeded to apply the *NARUC I* test. Therefore, unlike the Bureau, the Commission never relied on the *CMRS Order* for its decision in the first place, and the Commission thus never imposed on itself a requirement to follow the standard announced in the *CMRS Order*.

No more successful is petitioner's contention that the Commission's position is inconsistent with its decisions in *Federal– State Joint Board on Universal Service*, 12 F.C.C.R. 87 (1996) (*"Universal Service Recommended Decision"*), and *Implementation of the Non–Accounting Safeguards of Sections 271 and 272 of the Communications Act of 1934, as amended*, 11 F.C.C.R. 21905 (1996) (*"Non-Accounting Safeguards Order"*). Again, petitioner's challenges erroneously rely on the assumption that the Commission's decision turned on the fact that AT&T–SSI could be characterized as a wholesaler, when, in fact, no such wholesaler-retailer distinction is assumed by the Commission.

The source of the confusion is petitioner's failure to distinguish between a "recommended decision" and an "order."

*Universal Service Recommended Decision* stated that wholesale carriers' activities "are included in the phrase 'to such classes of eligible users as to be effectively available to a substantial portion of the public,' " and that carriers that "lease capacity to other carriers ... would be considered carriers that provide ... telecommunications services." *Universal Service Recommended Decision* ¶ 788 (quoting 47 U.S.C. § 153(46)). However, such recommendations were not adopted by the Commission until it released *Federal-State Joint Board on Universal Service*, 12 F.C.C.R. 8776 (1997) (*"Universal Service Order"*). Although the *Universal Service Order* adopted most of the recommendations contained in the *Universal Service Recommended Decision*, the Commission rejected the portion of the analysis that petitioner cites. Instead, the Commission observed that "the definition of 'telecommunications services' ... is intended to encompass only telecommunications provided on a common carrier basis," *Universal Service Order* ¶ 785, and, accordingly, "private network operators that lease excess capacity on a noncommon carrier basis" are not telecommunications carriers under the 1996 Act because they are not "common carriers." *Id.* ¶ 786. While the Commission acknowledged that common carriers' customers need not be "end users" and that "[c]ommon carrier services include services offered to other carriers," it emphasized that "a carrier may be a common carrier if it holds itself out to service indifferently all potential users," and that "a carrier will not be a common carrier where its practice is to make individualized decisions in particular cases whether and on what terms to serve." *Id.* ¶ 785 (quotations omitted).

Petitioner's contention that the Commission's *Non-Accounting Safeguards Order* is inconsistent with the *Commission Order* at issue does not work, either.[8] The rele-

---

8. As the Commission notes, although the *Non-Accounting Safeguards Order* was reconsid-

ered in *Implementation of the Non–Accounting Safeguards of Sections 271 and 272 of the*

vant portions of *Non-Accounting Safeguards Order*, if anything, are very similar to the *Commission Order*. For instance, the Commission noted in the *Non-Accounting Safeguards Order* that "the definition of telecommunications services is intended to clarify that telecommunications services are common carrier services." *Non-Accounting Safeguards Order* ¶ 263. It also stated that the term "telecommunications service" created a distinction between "common and private carriage." *Id.* ¶ 265. It did observe that common carrier services "include wholesale services to other carriers," *id.* ¶ 263, that "the term 'telecommunications service' was not intended to create a retail/wholesale distinction," *id.* ¶ 265, and that "[n]either the Commission nor the courts ... has construed 'the public' as limited to end-users of a service." *Id.* However, none of these statements is inconsistent with the Commission's grant of AT&T–SSI's application. Again, the Commission never relies on a wholesale-retail distinction; the focus of its analysis is on whether AT&T–SSI offered its services indiscriminately in a way that made it a common carrier under *NARUC I*, and the fact that AT&T–SSI could be characterized as a wholesaler was never dispositive.

Accordingly, we deny the petition for review.

*Communications Act of 1934, as amended,* 12 F.C.C.R. 8653 (1997), there was no reconsideration of the initial position relevant to the instant case. We focus on the initial order because it contains a more detailed discussion of the relevant issue.