# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
August 4, 2023

Lyle W. Cayce
Clerk

————————

No. 22-20454

————————

Crown Castle Fiber, L.L.C.,

*Plaintiff—Appellee*,

*versus*

City of Pasadena, Texas,

*Defendant—Appellant*.

———————————————————

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:20-CV-3369

———————————————————

Before Smith, Higginson, and Willett, *Circuit Judges*.

Jerry E. Smith, *Circuit Judge*:

This case is part of the battle between telecommunications providers that are attempting to expand next-generation wireless services (commonly called 5G) and municipalities that are resisting that expansion. Although the usual fights over installation of new technology involved local governments' imposing hefty fees,[1] the City of Pasadena used another method: aesthetic-design standards incorporating spacing and undergrounding requirements.

---

[1] *See, e.g.*, *City of Portland v. United States*, 969 F.3d 1020, 1035–36 (9th Cir. 2020).

No. 22-20454

The city invoked those requirements to block Crown Castle's[2] ability to develop a 5G network in the region, and Crown Castle sued for relief.

Congress and the Federal Communications Commission ("FCC") anticipated those strategies and previously had passed the Federal Telecommunications Act ("FTA") and responsive regulations. As a result, the district court decided in favor of Crown Castle, primarily basing its decision on the expansive language of the FTA and an FCC ruling interpreting the Act in light of 5G technology and associated challenges. The court determined that the City of Pasadena's requirements that functionally blocked the buildout of Crown Castle's infrastructure were preempted by the FTA. It entered summary judgment for Crown Castle and imposed a permanent injunction prohibiting the city's use of its Design Manual.

We agree with the district court. The FTA preempts the city's spacing and undergrounding requirements, and the city forfeited its arguments relating to the safe-harbor provision in the FTA. Nor did the district court abuse its discretion in ordering a permanent injunction. We affirm.

I.

Telecommunications providers are expanding 5G networks throughout the country. But 5G requires higher radio frequencies than did previous-generation networks, thereby requiring telecommunications and mobile service providers to install new equipment and infrastructure. Previous networks used tall towers spaced far apart to provide service, as the lower-frequency waves they used could travel long distances and through objects.

In contrast, the higher radio frequencies used for 5G communications

_____

[2] Crown Castle Fiber, L.L.C., is referred to as Crown Castle by both parties. This designation also refers to its predecessor-in-interest, Crown Castle NG Central, L.L.C.

No. 22-20454

cannot easily pass through buildings and can only travel short distances. As a result, telecommunications providers have begun using "small cell sites" placed close together to relay signals in an umbrella-esque pattern to provide similar coverage by relaying signals further distances and around obstacles. Unlike the infrastructure required for older networks, the small cell sites can be installed on utility poles, buildings, streetlights, and other structures. Such a buildout of small cells is referred to as "densification."

Crown Castle entered into a contract with T-Mobile whereby Crown Castle agreed to provide T-Mobile with a small cell, distributed antenna systems ("DAS") network in the Houston market, which includes the City of Pasadena. Crown Castle specifically offers telecommunications services by providing network "nodes" and "fiber." More precisely, Crown Castle uses its infrastructure to transport its customer's (here, T-Mobile's) voice and data signals through these nodes and fiber networks, allowing T-Mobile (or any other wireless service provider it contracts with) to service a particular area with 5G. To build out a small cell network, Crown Castle must install the physical infrastructure, and the company alleged that it must have access to public rights-of-way to accomplish that task, which requires a permit.

The twist is that the city has a small cell ordinance and a Design Manual for the Installation of Network Nodes and Node Support Poles (the "Manual"). The Manual was adopted in 2017, purportedly to comply with state law. It requires that new support poles for a network must be spaced at least 300 feet from existing utility poles or other node support poles.[3]

_____

[3] In full, the ordinance requires the following:

New node support poles shall be spaced apart from existing utility poles or Node Support poles at the same distance as the spacing between utility poles in the immediate proximity, but no less than at a minimum 300 feet from a utility pole or another Node Support Pole to minimize the hazard of poles adjacent to road ways and to minimize

No. 22-20454

Additionally, in 2021, after Crown Castle had sued, the city updated the Manual to include an additional restriction ("undergrounding"):

> A Network Provider is prohibited from installing above ground on an existing pole a Network Node and related equipment in a public right of way in a residential area. . . . [A]ll the equipment is required to be installed underground for the safety of the residents and the aesthetics of the area.[4]

Almost all equipment associated with a network node must be stored underground in residential areas.

In 2017, Crown Castle and T-Mobile identified 100 locations in the city's public rights-of-way where Crown Castle wanted to build new utility poles (otherwise known as "nodes"). Of those, 33 were in residential neighborhoods. After discussions with the city,[5] Crown Castle applied for right-of-way permits for the 67 non-residential locations. Crown Castle divided the applications into 3 batches per the city's request. In June 2019, for the first batch, the city rejected 16 of Crown Castle's first 22 applications because they violated the spacing requirement. Crown Castle reviewed its remaining proposed locations and determined that they, too, would violate the spacing requirement.

The parties disagree about whether Crown Castle and T-Mobile explored alternatives, such as placing the new nodes on existing infrastructure. The city maintains that Crown Castle did not attempt to identify new

_____

[the] effect on property values and aesthetics on the area.

[4] The only exception is for an "antenna that cannot operate when placed underground."

[5] The timeline is unclear, but it appears Crown Castle eventually applied for permits for 3 of the 33 residential locations, and the city permitted one. Although the city rejected those applications before the undergrounding requirement, all 33 are now subject to the undergrounding requirement Crown Castle challenges.

locations or create a network map that would comply with the Manual. Crown Castle represents that it did so and rejected using existing infrastructure because it was not located at the correct height[6] or in feasible areas. Crown Castle alleges that only seven existing poles in Pasadena would have satisfied the city's and Crown Castle's criteria.[7] Crown Castle also avows that placing the required radio equipment underground in Pasadena is technologically impossible because of concerns with overheating and Pasadena's regular flooding.

In September 2020, Crown Castle sued for declaratory and injunctive relief, alleging that the minimum spacing restriction violated, and was thus preempted by, both 47 U.S.C. § 253(a) and Texas state law.

After the district court denied the city's motion to dismiss, the city never filed an answer to the complaint. Even after the city had updated its Manual in 2021 to include the undergrounding requirement, and Crown Castle amended its complaint to allege that that requirement was also preempted, the city still did not answer the complaint. Only after nine months had passed since the deadline to file an answer did the city move for leave to file an answer, averring that the delay resulted from an "oversight" and "inadvertent mistake" by its counsel. The district court refused to accept that explanation as sufficient, denied the city's motion, and decided that the city had forfeited[8] affirmative defenses.

_____

[6] According to Crown Castle, the centerline of the antennas must be located between 31 and 35 feet above ground.

[7] These seven poles belonged to AT&T. Crown Castle contends it discussed putting nodes on the poles owned by Centerpoint, an energy and utility provider. But all of Centerpoint's poles were the wrong height and in the wrong locations.

[8] The district court used the term "waived," but we employ the more precisely accurate word "forfeited."

Both sides sought summary judgment. The district court ruled in Crown Castle's favor and permanently enjoined the city from enforcing the regulations against Crown Castle. First, the court ruled that it had jurisdiction to hear the case because, as a preemption dispute, it involved a federal question, and it was of no consequence that § 253(a) has no private right of action.

On the merits, the district court ruled that its analysis of whether densification effects were protected by § 253(a) was controlled[9] by the FCC's rule stating that densification effects were so protected.[10] Nor did the city properly challenge the FCC's conclusions as arbitrary and capricious. As a result, the district court found that § 253(a) did preempt the city's small cell node regulations, as they violated the FTA by preventing Crown Castle from providing telecommunications services.

The district court also rejected the city's argument that § 253(c), which provides that state and local governments may manage their public rights-of-way in a reasonable and nondiscriminatory manner, acted as a safe harbor. First, the court noted that the city had forfeited the affirmative defense by failing to answer the complaint. Secondly, adjudicating the affirmative defense on the merits, the court concluded that the section still did not allow the city's discriminatory treatment of Crown Castle's applied small cell

_____

[9] The court stated that "[u]nder the Hobbs Act, the Court does not have jurisdiction to review the merits [of the] FCC Order and thus is bound by the FCC's prior ruling."

[10] The FCC rule discussed in the district court's opinion and which played a role in both the preemption and safe harbor decision is the FCC's Declaratory Ruling regarding how § 253 applies to small cell nodes. *See In re Accelerating Wireless Broadband Deployment by Removing Barriers to Infrastructure Investment* ("*Small Cell Order*"), 33 FCC Rcd. 9088 (2018); *see also Accelerating Wireless and Wireline Broadband Deployment by Removing Barriers to Infrastructure Investment*, 83 Fed. Reg. 51867 (Oct 15, 2018) (codified at 47 C.F.R. pt. 1).

nodes. Then the court granted Crown Castle a permanent injunction but stayed it pending this appeal.

## II.

We review issues of Article III standing *de novo*. *Contender Farms, L.L.P. v. U.S. Dep't of Agric.*, 779 F.3d 258, 264 (5th Cir. 2015). "[F]ederal courts are under an independent obligation to examine their own jurisdiction . . . ." *FW/PBS, Inc. v. City of Dall.*, 493 U.S. 215, 231 (1990). The district court granted summary judgment on the basis of federal preemption, a question of law reviewed *de novo*. *Friberg v. Kan. City S. Ry. Co.*, 267 F.3d 439, 442 (5th Cir. 2001).

We review a summary judgment *de novo* as well. *Norman v. Apache Corp.*, 19 F.3d 1017, 1021 (5th Cir. 1994). A party is entitled to summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "As is appropriate at the summary-judgment stage, facts that are subject to genuine dispute are viewed in the light most favorable to [the non-moving party]." *Taylor v. Riojas*, 141 S. Ct. 52, 53 n.1 (2020) (per curiam).

This court reviews a permanent injunction for abuse of discretion. *Thomas v. Hughes*, 27 F.4th 995, 1011 (5th Cir. 2022) (citing *ICEE Distribs., Inc. v. J&J Snack Foods Corp.*, 325 F.3d 586, 594 (5th Cir. 2003)). "An abuse of discretion occurs where the trial court '(1) relies on clearly erroneous factual findings . . . [,] (2) relies on erroneous conclusions of law . . . , or (3) misapplies the factual or legal conclusions when fashioning its injunctive relief.'" *Id.* (alterations and omissions in original) (quoting *Peaches Ent. Corp. v. Ent. Repertoire Assocs., Inc.*, 62 F.3d 690, 693 (5th Cir. 1995)).

### III.

Crown Castle's claims are justiciable. Because its preemption claim presents a federal question, that establishes jurisdiction. Although the city's theory that § 253 of the FTA does not provide a private right of action is correct, that fact does not override Crown Castle's ability to bring a preemption claim. Additionally, Crown Castle has pleaded facts sufficient for Article III standing, and its claims are ripe.

### A.

The city spends most of its briefing alleging that Crown Castle's suit is non-justiciable because § 253 does not provide a private right of action that would enable Crown Castle to sue to enforce the mandate of the FTA. Additionally, the city posits that Crown Castle is not even a telecommunications service provider covered by § 253. The city is incorrect.

Congress enacted the FTA to "reduc[e] . . . the impediments imposed by local governments upon the installation of facilities for wireless communications." *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 115 (2005). To that end, § 253(a) provides a comprehensive regulatory scheme that constrains the ability of states and municipalities to regulate telecommunications: "No . . . local statute or regulation, or other . . . local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service."

Still, as the city notes, § 253(a) focuses on "prohibitions on what the state or local government cannot do, rather than on a right for telecommunications companies." *Sw. Bell Tel., LP v. City of Hous.*, 529 F.3d 257, 261 (5th Cir. 2008). Accordingly, our circuit stated in *Southwestern Bell* that § 253(a) does not establish a private right of action enforceable under 42 U.S.C. § 1983. *Id.* And under 47 U.S.C. § 253(d), the FCC is charged with "preempting the enforcement of laws violating . . . § 253(a)." *Id.* at 262

(internal quotations omitted). As in the present case, our court was asked to determine whether a local regulation was preempted by § 253(a). *Id.*

Nevertheless, the city's reliance on *Southwestern Bell* is misplaced. Even though we acknowledged that the FCC is the primary caretaker and enforcer of the FTA, the actual holding was more constrained than the city believes. "[B]ecause the FTA does not unambiguously establish a private enforceable right, and, in the alternative, because . . . § 253(d) contains a comprehensive enforcement scheme, Congress did *not* intend to create a private right, enforceable under § 1983, for claimed violations of . . . § 253(a)." *Id.*

But Crown Castle is not seeking a legal remedy through § 1983. Instead, it brings a claim that the FTA preempts the City's Manual. In *Southwestern Bell* itself, we made that distinction clear. A "plaintiff's seeking relief from a state regulation on the ground of preemption by a federal statute 'presents a federal question which federal courts have jurisdiction under 28 U.S.C. § 1331 to resolve.'" *Id.* (quoting *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 n.14 (1983)).

It is worth discussing *Southwestern Bell* further. There, AT&T built various facilities in the public rights-of-way in Houston, which then enacted an ordinance requiring the owners of facilities located in the public rights-of-way to bear the costs of relocating their equipment if the city carried out a public works project in the same location. The ordinance was not targeted at telecommunications providers but required any facility located in a public right-of-way to be moved at the owner's expense. AT&T spent $420,000 relocating equipment and sued to recover the relocation costs. The company asserted a claim under the FTA through § 1983 and a federal preemption claim.

*Southwestern Bell* first analyzed whether the FTA creates a private

right of action. *Id.* at 259–62. The court noted that although the circuits were split, a faithful textual reading of the statute post–*Gonzaga University v. Doe*, 536 U.S. 273, 283 (2002),[11] indicated that "§ 253 does not create a private right of action for damages that may be enforced through § 1983." *Sw. Bell*, 529 F.3d at 261 (cleaned up). But Crown Castle is not asking for damages here. The company seeks declaratory and injunctive relief, bringing the suit in equity.

On that note, the panel analyzed AT&T's federal preemption claim *separately* and stated that a "party may bring a claim under the Supremacy Clause that a local enactment is preempted even if the federal law at issue does not create a private right of action." *Id.* at 262 (quoting *Qwest Corp. v. City of Santa Fe*, 380 F.3d 1258, 1266 (10th Cir. 2004)). In *Southwestern Bell*, AT&T's preemption-based arguments failed because of inadequate pleading and the inability to show that the ordinance was not "competitively neutral and nondiscriminatory." *See id.* at 262–64. Houston's ordinance, therefore, was sheltered by the safe harbor provision of § 253(c),[12] and preemption did not apply. *Id.* at 263–64. But, vitally, the court did not dismiss the federal preemption argument for lack of subject matter jurisdiction. The question whether we have jurisdiction is separate from whether there is a cause of action. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998).

---

[11] *Gonzaga* requires courts to determine whether Congress intended to create a federal right, and "where the text and structure of a statute provide no indication that Congress intend[ed] to create new individual rights, there is no basis for a private suit, whether under § 1983 or under an implied right of action." 536 U.S. at 286.

[12] The subsection provides that "[n]othing in [§ 253] affects the authority of . . . local government to manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers, on a competitively neutral and non-discriminatory basis, for use of public rights-of-way on a nondiscriminatory basis, if the compensation required is publicly disclosed by such government."

The same holds true here.  The "ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015).  Hence, in *Green Valley Special Utility District v. City of Schertz*, we noted that the plaintiff had "a cause of action against [defendants] *at equity*, regardless of whether it can invoke § 1983."  969 F.3d 460, 475 (5th Cir. 2020) (en banc) (citing *Ex parte Young*, 209 U.S. 123, 149 (1908)).  Even though § 253 does not confer a private right, a plaintiff is not prevented from gaining equitable relief on preemption grounds.  Accordingly, Crown Castle can bring its federal preemption claim.[13]

## B.

The city maintains that Crown Castle is not a telecommunications provider and is not subject to the protections of § 253(a).  To the contrary, Crown Castle is a telecommunications provider under the Act, and thus the city's theory that Crown Castle did not provide services itself, but "merely agreed to install radios and antennae to allow T-Mobile to expand *T-Mobile's* telecommunications service," is untenable.[14]

---

[13] In reply, the city points to Judge Oldham's concurrence in *Green Valley*, where he cast doubt on whether a plaintiff could sue in equity without belonging to a particular class of citizens with a legislatively conferred cause of action.  969 F.3d at 497 (Oldham, J., concurring) (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127 (2014)).  But that is not the law of this circuit.

[14] It is possible that Crown Castle could sue under § 253(a) even if it were not a telecommunications provider.  As Crown Castle states, we usually look to injury-in-fact when determining standing to sue.  Crown Castle likely satisfies the injury prong, and so with that injury, it may be entitled to injunctive relief.  As a result, the city's argument that Crown Castle is not protected by § 253(a) is not a jurisdictional issue, and "courts should not treat a statutory provision as jurisdictional unless 'the Legislature *clearly* states that a threshold limitation on a statute's scope shall count as jurisdictional.'"  *Biziko v. Van Horne*, 981 F.3d 418, 421 (5th Cir. 2020) (quoting *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 515 (2006)).  Because we conclude that Crown Castle is a telecommunications provider, we

No. 22-20454

"[W]e begin where all such inquiries must begin: with the language of the statute itself." *Republic of Sudan v. Harrison*, 139 S. Ct. 1048, 1056 (2019) (cleaned up). The "judicial inquiry . . . ends there as well if the text is unambiguous." *Tex. Educ. Agency v. U.S. Dep't of Educ.*, 908 F.3d 127, 132 (5th Cir. 2018) (cleaned up). The FTA defines "telecommunications service" as "the offering of telecommunications for a fee directly to the public, or to such classes of users as to be effectively available directly to the public, regardless of the facilities used." 47 U.S.C. § 153(53).[15]

The district court noted that "providers of 'telecommunications service' are equivalent to 'common carriers,' meaning . . . provider[s] who 'hold[] [themselves] out indiscriminately.'"[16] Applying that definition, the court reasoned that because "Crown Castle's services enable common carriers, like T-Mobile in this case, to provide telecommunications services to the general public, . . . Crown Castle's services are available to 'classes of users as to be effectively available directly to the public.'" We see no error.[17]

_____

pretermit discussion of that issue.

[15] "Telecommunications" are "the transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or the content of the information as sent and received." 47 U.S.C. § 153(05). As discussed *supra*, the voice and data signals that Crown Castle transports through its nodes and fiber infrastructure and DAS network appear to fall readily within that definition.

[16] Quoting *Crown Castle NG E. Inc. v. Town of Greenburgh*, No. 12-CV-6157, 2013 WL 3357169, at *15 (S.D.N.Y. July 3, 2012).

[17] Numerous other courts have found that Crown Castle or its predecessors are telecommunications providers. *See, e.g.*, *NextG Networks of NY, Inc. v. City of New York*, 513 F.3d 49, 50 (2d Cir. 2008); *Crown Castle NG E. LLC v. City of Rye*, No. 17-CV-3535, 2017 WL 6311693, at *4 (S.D.N.Y. Dec. 8, 2017); *Crown Castle NG Atl. LLC v. City of Newport News*, No. 15-CV-93, 2016 WL 4205355, at *3 (E.D. Va. Aug. 8, 2016); *Crown Castle Fiber LLC v. City of Charleston*, 448 F. Supp. 3d 532, 534 (D.S.C. 2020). Although not all of those opinions go through a textual analysis to determine whether Crown Castle is a telecommunications provider under the statute, they still remain persuasive.

Nevertheless, the city urges us to read the statutory language to indicate that the statute covers only a servicer that provides the product to the end user. That definition reads "effectively available directly to the public" out of the statute. "As a cardinal principle of statutory construction, the presumption against superfluity requires the court to give effect, if possible, to every clause and word of a statute . . . rather than to emasculate an entire section." *Tex. Educ. Agency*, 908 F.3d at 133 (cleaned up) (omission in original).

It is evident that Crown Castle sells its services to the public by establishing the infrastructure to enable T-Mobile to provide wireless service and to transmit T-Mobile's voice and data signals across its network. T-Mobile is undoubtedly a common carrier, and Crown Castle, through its network and infrastructure contract, fits neatly within the protective umbrella of § 253(a).

The city's main cited case suggesting otherwise is not applicable. The city points to *Virgin Islands Telephone Corp. v. FCC*, 198 F.3d 921, 930 (D.C. Cir. 1999), to urge that Crown Castle is a private network operator. That contention is inaccurate. In *Virgin Islands*, the D.C. Circuit found that the plaintiff was not a common carrier because it made the "bulk capacity in its system" available only to a "significantly restricted class of users," preventing the public from being "able to make use of the cable as a practical matter." *Id.* at 924–30. No such fact has ever been alleged here. Crown Castle's services, through T-Mobile, are available to anyone who wishes to pay. The company is a telecommunications provider under the FTA.

## C.

Finally, the city asserts that Crown Castle lacks Article III standing because its claims are not ripe. We review two factors to determine ripeness: "the fitness of the issues for judicial decision" and "the hardship to the

parties of withholding court consideration."[18] A claim is "fit for judicial decision if it presents a pure question of law that needs no further factual development." *Braidwood Mgmt., Inc. v. EEOC*, 70 F.4th 914, 930 (5th Cir. 2023) (cleaned up). An unripe claim is "contingent [on] future events that may not occur as anticipated, or indeed may not occur at all." *Id.* at 930–31 (alteration in original) (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580–81 (1985)).

The city avers the case is not fit for consideration: The court should wait to evaluate the issues at play because Crown Castle has not sought a permit under the city's new undergrounding requirement and has submitted only about a third of the planned applications, of which the city approved a few. Moreover, Crown Castle did not submit applications for the other sites. Instead, it undertook its own review and "simply decided that all 45 proposed locations to be submitted would violate the Manual's 300-foot spacing requirement." The city also takes umbrage that Crown Castle never requested a variance for the denied applications. The city consequently has not taken a "final, definitive position" about the permits, and the claim is not ripe. For similar reasons, claims based on the other unsubmitted applications are not ripe either.

We go back to first principles to decide ripeness. Crown Castle's claims turn on a pure question of law: Is the Manual preempted by § 253? *See Franks Inv. Co. v. Union Pac. R.R.*, 593 F.3d 404, 407 (5th Cir. 2010) ("The preemptive effect of a federal statute is a question of law . . . ."). There is no factual dispute that the spacing and undergrounding requirements apply to most of Crown Castle's intended pole locations.

---

[18] *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 149 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977).

No. 22-20454

As a result, the Manual is the only thing preventing Crown Castle from building out its telecommunications grid. Crown Castle has been harmed and continues to allege injury on account of the Manual, and no further factual development will aid in adjudicating the claim. Moreover, because of those ongoing harms, Crown Castle will experience hardship if we do not consider its claim. *Cf. Braidwood*, 70 F.4th at 931–32.

The city has no persuasive counter-argument. The caselaw it presents primarily invokes the ripeness standard involved in takings cases.[19] And we do not look to its presented ripeness test outside a takings claim. *See Monk v. Huston*, 340 F.3d 279, 282 (5th Cir. 2003). Without that test, the city merely states that Crown Castle was required to ask for a variance for rejected petitions, submit petitions for every other node despite the poor success rate, and change the design of its nodes to comply with the city's requirements. Those theories are divorced from caselaw and resemble exhaustion requirements more than ripeness requirements. As discussed above, Crown Castle met the requirements for ripeness by showing that the case is fit for judicial resolution and that there is ongoing harm. Nothing more is required. Crown Castle's claims are ripe.

## IV.

Next, the merits. The city failed to challenge the merits adequately in its opening brief and did not correctly raise § 253(c) as an affirmative defense in the district court. But even if we review the merits of the city's arguments, the district court was correct to follow the FCC's order controlling the result.

---

[19] *See, e.g.*, *Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 186 (1985), *overruled by Knick v. Twp. of Scott*, 139 S. Ct. 2162 (2019).

No. 22-20454

## A.

To begin, the district court clearly stated that, per the Hobbs Act,[20] its analysis was bound by the FCC's *Small Cell Order*. In that order, the FCC stated that a local legal requirement constitutes an effective prohibition on the ability of an entity to provide telecommunications service where the legal requirement "materially inhibits" the "critical deployments of Small Wireless Facilities and [the] nation's drive to 5G. *Small Cell Order*, 33 FCC Rcd. at 9102–03. Per the order, a spacing requirement can create a material inhibition of wireless service in violation of § 253(a). *See id*. at 9132. The district court correctly relied on that determination to find material inhibition.

Additionally, the FCC Order indicates that spacing requirements can be unreasonable if they effectively prohibit the construction of nodes through discriminatory application.[21] The FCC Order discusses similar undergrounding requirements, noting that "a requirement that *all* wireless facilities be deployed underground would amount to an effective prohibition given the propagation characteristics of wireless signals." *Id*. at 9133. The court

---

[20] Unlike the district court, we do have jurisdiction to review the order. *See* 28 U.S.C. § 2342 ("The court of appeals . . . has exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of . . . all final orders of the Federal Communication Commission made reviewable by section 402(a) of title 47.").

[21] *See, e.g.*, *Small Cell Order*, 33 FCC Rcd. at 9133 ("For example, under the principle that any such requirements be reasonable and publicly available in advance, it is difficult to envision any circumstances in which a municipality could reasonably promulgate a new minimum spacing requirement that, in effect, prevents a provider from replacing its preexisting facilities or collocating new equipment on a structure already in use."); *see also id*. at 9132 ("Analogously, aesthetic requirements that are reasonable in that they are technically feasible and reasonably directed to avoiding or remedying the intangible public harm of unsightly or out-of-character deployments are also permissible."); *cf. City of Portland*, 969 F.3d at 1041 ("[R]easonable regulatory distinctions among functionally equivalent, but physically different services [are allowed].").

relied on that text to find that the underground requirement was preempted.

Yet, on appeal in its opening brief, the city does not mention the Hobbs Act or the FCC Order once. No attempt is made to contest the notion that the district court was not bound by the ruling of the FCC, or even if it was, that the district court erred in its application of the FCC's ruling.

Although the city attacks the reasoning of the district court's approach indicating that § 253(a) preempts the Manual's requirements, the city fails to grapple with the fact that the district court based its entire preemption decision on the FCC's *Small Cell Order*, through the jurisdictional bounds of the Hobbs Act. The present adjudication cannot be decided without appropriately reviewing the effect of the FCC's 2018 declaratory ruling.

Parties forfeit contentions by inadequately briefing them on appeal. *Rollins v. Home Depot USA*, 8 F.4th 393, 397 (5th Cir. 2021); *see also* FED. R. APP. P. 28(a)(8)(A). Adequate briefing requires a party to raise an issue in its opening brief. *United States v. Bowen*, 818 F.3d 179, 192 n.8 (5th Cir. 2016). "To be adequate, a brief must address the district court's analysis and explain how it erred." *SEC v. Hallam*, 42 F.4th 316, 327 (5th Cir. 2022) (cleaned up). The city's brief is inadequate. Instead of making a substantial argument on the merits, it decided primarily to contest that Crown Castle lacked standing to litigate § 253(a). Having failed there, the city must lie in the bed that it made.

In its reply brief, the city finally mentions that the district court was "bound by the FCC's prior ruling" but that we are not entitled to give the Order *Chevron* deference[22] because § 253(a) is unambiguous. Even if true, the contention needed to be raised in the opening brief.

---

[22] *See Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984).

### B.

Similarly, the district court did not err in deciding that the city's failure to answer Crown Castle's complaint indicated that it forfeited all affirmative defenses. Federal Rule of Civil Procedure 8(c) indicates that affirmative defenses must be raised in the first responsive pleading, which here would have been the answer (or the motion to dismiss). Instead, the city waited until its summary judgment motion to raise § 253(c). Statutory exemptions such as § 253(c) must be pleaded as affirmative defenses. *See Oden v. Oktibbeha Cnty.*, 246 F.3d 458, 467 n.10 (5th Cir. 2001).

Notwithstanding the formal procedures, there is "play in the joints," and "technical failure to comply precisely with Rule 8(c) is not fatal." *Rogers v. McDorman*, 521 F.3d 381, 385–86 (5th Cir. 2008) (cleaned up). The main concern is "unfair surprise," so we do not permit litigants to be able to "lie behind a log" and "ambush a plaintiff." *Id.* at 385 (cleaned up). On the whole, though, unfair surprise is present here.

The city avers that it first raised the § 253(c) safe harbor defense in its motion to dismiss Crown Castle's complaint, which would satisfy Rule 8(c). But the only mention of § 253(c) in the motion to dismiss was in relation to the city's theory that Crown Castle's claim correctly arose under § 332(c)(7) instead of § 253. That is not a proper method to raise an affirmative defense. Nowhere was Crown Castle notified that the city would raise a § 253(c) defense to a § 253(a) preemption claim. As a result, the statements in the motion to dismiss did not put Crown Castle on notice, and Crown Castle remained "prejudiced in its ability to respond." *Pasco ex rel. Pasco v. Knoblauch*, 566 F.3d 572, 577 (5th Cir. 2009) (quoting *Allied Chem. Corp. v. Mackay*, 695 F.2d 854, 856 (5th Cir. 1983) (per curiam)).

Furthermore, as the district court noted, failure to answer the operative complaint is not excusable. A failure timely to answer or raise an affirma-

tive defense before springing it on plaintiffs at summary judgment almost always constitutes an "unfair surprise." There is no reason to doubt the capable judgment of the district court on this matter.

## C.

Regardless, even reviewing the merits of the city's arguments, it still loses. Although one might challenge the constitutional validity of the Hobbs Act,[23] the district court was correct to follow the FCC's order controlling the result. Furthermore, no party challenges the constitutionality of the Hobbs Act. As a result, there is no error in the district court's application of the FCC's Order.[24] The district court correctly determined that the city's regulations "effectively prohibit[] Crown Castle from providing telecommunications services" and are preempted under § 253(a). Nor is the city protected by § 253(c) because the Manual's restrictions and rules are not "competitively neutral and nondiscriminatory."

The city's primary claim against preemption is that § 253(a) does not

---

[23] The Hobbs Act essentially strips the jurisdiction of district courts to consider the validity of an agency's legal interpretation of the statutes contained therewithin, including the FTA. Circuit courts have exclusive jurisdiction to determine the validity of final orders, and only if a party seeks judicial review within 60 days of entry of the final order. 28 U.S.C. § 2342. But nowhere in the Hobbs Act does it state that the interpretation of the statutes cannot be challenged in later enforcement proceedings. Under the Administrative Procedure Act, usual administrative law principles permit parties to raise as-applied challenges. *See PDR Network, LLC v. Carlton & Harris Chiropractic, Inc.*, 139 S. Ct. 2051, 2058 (2019) (Kavanaugh, J., concurring in the judgment).

[24] On appeal, the city raises for the first time that as-applied challenges are not permitted under § 253. The city's support is less than persuasive and invokes no controlling precedent. Moreover, it seems likely that the challenge is facial—the district court placed a permanent injunction on enforcement of the Manual and stated that the policies themselves, not just as applied to Crown Castle, were unreasonable under the test outlined in the FCC's *Small Cell Order*. Regardless, given that this issue was not raised at summary judgment, we cannot consider it. *See Keelan v. Majesco Software, Inc.* 407 F.3d 332, 339–40 (5th Cir. 2005).

apply to densification efforts. But the FCC has clearly stated that it considers the statute's requirement of an effective prohibition to include a material inhibition on the ability of a provider to deploy small wireless facilities, including cells. *See Small Cell Order*, 33 FCC Rcd. at 9102–04.

The city maintains that T-Mobile already provides 5G and 4G/LTE service through Pasadena, and its rejected nodes would merely "augment" the existing service. That reading is too limited, given the expansive "any" mentioned in the statute. Section 253(a) broadly protects the ability of "any" entity to provide "any" telecommunications service.[25]

Furthermore, the city's favored reading flies in the face of common sense: Just because a provider can provide some limited level of service does not mean that it cannot improve that level, expand its capacity, or otherwise offer an upgraded or additional form of telecommunications service. All those boons seem to fall within the scope of the statute's text.

The same is true of the undergrounding requirement. The district court accepted Crown Castle's contention that requiring the burying of all nodes underground in residential areas would essentially destroy their efficacy. Per the FCC Order, a "requirement that *all* wireless facilities be deployed underground would amount to an effective prohibition." *Small Cell Order*, 33 FCC Rcd. at 9133. The district court found that the restrictions on the construction of nodes were unreasonable and made it technically infeasible for Crown Castle to provide a telecommunications service. The city provides no persuasive evidence that the district court's reasoning is incorrect. Under the current regulations, no party disagrees that Crown Castle

---

[25] *See Chamber of Com. of U.S. v. U.S. Dep't of Lab.*, 885 F.3d 360, 373 (5th Cir. 2018), *judgment entered sub nom. Chamber of Com. of Am. v. U.S. Dep't of Lab.*, No. 17-10238, 2018 WL 3301737 (5th Cir. June 21, 2018) (stating that the use of "any" in a statute embodies an "expansive interpretation" for an agency).

likely cannot build its network in Pasadena.  There is no error here.

Nor is the § 253(c) safe harbor applicable to either requirement.  In that section, municipal rules governing rights-of-ways that are "competitively neutral and nondiscriminatory" are permitted.  The district court determined that that certainly was not the case, as only small cell technology was subject to the spacing and undergrounding requirements in the Manual.

The city barely offers a response, merely stating that it has almost unlimited authority to manage the public rights-of-way.  For example, the city states, "[t]he City's authority to 'manage the public rights-of-way' encompasses its right to deny Crown Castle's applications based upon *any* applicable requirement contained in the City's design manual, including the City's minimum spacing and undergrounding requirements."

That position does not grapple, however, with the district court's finding that the city's right was limited by the discriminatory targeting of the Manual on small cell nodes.  And there is no plausible counterargument: As the court found, the regulations affect only small cell nodes that would permit T-Mobile to offer extensive 5G service in Pasadena.  The district court was correct.

## V.

Finally, the district court did not abuse its discretion in entering a permanent injunction.  As the city correctly notes, a party seeking a permanent injunction must establish (1) actual success on the merits; (2) that it is likely to suffer irreparable harm in the absence of injunctive relief; (3) that the balance of equities tips in that party's favor; and (4) that an injunction is in the public interest.  *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 32 (2008).

All those factors weigh in Crown Castle's favor.  The above analysis

shows that Crown Castle succeeded in its preemption claim. Crown Castle will suffer irreparable harm if it cannot build its network under its contract with T-Mobile. Its harm outweighs whatever disadvantage the city will suffer in response. Finally, the weight of the FCC's Order and the importance of building out our nation's telecommunications network demonstrate that the injunction is in the public interest.

Moreover, we review the district court's determinations on these factors for abuse of discretion. *See Thomas*, 27 F.4th at 1011. That is a demanding standard that the city does not satisfy.

The judgment, including the permanent injunction, is AFFIRMED.